569 So.2d 754 (1990)
William H. KELLEY, Appellant,
v.
STATE of Florida, Appellee.
No. 73088.
Supreme Court of Florida.
September 6, 1990.
Rehearing Denied December 10, 1990.
*755 Larry Helm Spalding, Capital Collateral Representative, and Billy H. Nolas, Chief Asst. CCR, Office of the Capital Collateral Representative, Tallahassee, and Barry Wilson and Maxine Sushelsky, Boston, Mass., for appellant.
Robert A. Butterworth, Atty. Gen., and Robert J. Krauss, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
William Kelley appeals the trial court's denial of his motion for postconviction relief *756 filed pursuant to rule 3.850, Florida Rules of Criminal Procedure. This Court previously affirmed Kelley's conviction and death sentence for the 1966 murder of Charles Von Maxcy. Kelley v. State, 486 So.2d 578 (Fla.), cert. denied, 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986). We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
The trial judge summarily denied several of Kelley's claims but conducted an evidentiary hearing on the claim that the prosecution suppressed evidence favorable to the defendant and the contention that the defendant was denied effective assistance of counsel.
Kelley first argues that the state's destruction of material evidence prior to his trial deprived him of his constitutional rights. In the prior appeal, this Court explained that because the case involving Maxcy's death had been closed for many years, the state obtained an order permitting the destruction of evidence. Several years later, the state initiated the prosecution of Kelley when new evidence came to light. This Court concluded that the state had not been negligent in causing the destruction of evidence and further held that the destruction of the evidence in question did not prejudice Kelley's case.
Kelley now argues that certain crime scene evidence was destroyed which was not encompassed within this Court's earlier ruling. However, it appears that many of the items characterized as "additional evidence" were discussed in a supplemental brief in Kelley's original appeal. Thus, while our opinion did not specifically discuss such additional evidence, it is clear that the issue was decided adversely to Kelley. Further, in affidavits submitted in support of the motion for postconviction relief, Kelley's trial counsel admitted knowing that the fruits of the police investigation had been destroyed. The state was not at fault in the destruction of the evidence. Kelley, 486 So.2d at 581. The destruction of evidence in this case did not deprive Kelley of due process of law. See Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (unless defendant shows bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process).
Two other claims are procedurally barred. The first of these is whether during a break in the defense counsel's cross-examination of a witness the state improperly showed to and discussed with the witness records which the defense was using to impeach the witness. The basis for Kelley's claim is contained in the trial record. Therefore, this claim should have been raised on appeal. Kelley also contends that his rights were violated by an improper closing argument. This is also a claim which should have been raised on appeal.
Kelley further claims that the court should have declared him indigent so as to provide him funding to obtain the services of certain experts. It should be noted that Kelley was being defended by private counsel rather than the capital collateral representative. Both of Kelley's lawyers admitted to being paid, though they declined to say who was paying them. Kelley mainly wanted experts to try to explain how he was hampered by his inability to have available the evidence which had been destroyed. However, he was procedurally barred from presenting the destruction of evidence point. With respect to his desire to hire a state attorney to testify as to what a reasonably trained prosecutor would have known to turn over to the defense pursuant to a request under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the judge properly observed that he was in a position to determine what constituted exonerating evidence which should be disclosed pursuant to Brady, without the need of expert testimony. The judge did not abuse his discretion in denying the request for funds to hire the experts. See Quince v. State, 477 So.2d 535 (Fla. 1985), cert. denied, 475 U.S. 1132, 106 S.Ct. 1662, 90 L.Ed.2d 204 (1986).
With respect to the two issues upon which testimony was taken, the judge's order succinctly addressed each of Kelley's contentions:

*757 "ORDER DENYING DEFENDANT'S MOTION TO VACATE JUDGMENT OF CONVICTION AND SET ASIDE SENTENCE OF DEATH

"INTRODUCTION
"THIS MATTER came before the court on the defendant's Motion to Vacate Judgement of Conviction and Set Aside Sentence of Death filed pursuant to FRCrP 3.850. The Motion contains six grounds for relief. However, the court earlier determined that four of the six grounds were inappropriate for post conviction relief because the issues were, or should have been, raised on direct appeal. The two remaining claims, the prosecution's suppression of evidence favorable to the defendant (Brady violation), and ineffective assistance of counsel, were addressed at an evidentiary hearing in Highlands County, Florida, on July 18 and 19, 1988. After considering the evidence and testimony presented, and argument of counsel, the court finds that the defendant is not entitled to relief.

"I. BRADY VIOLATION CLAIM
"The defendant's first claim is based on alleged Brady violations. Brady v. Maryland, 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (1963), holds that the prosecution bears the duty of disclosing to the defense any material exculpatory information in its possession. The United States Supreme Court refined the materiality standard in United States v. Agurs, 427 U.S. 97 [96 S.Ct. 2392, 49 L.Ed.2d 342] (1976), holding that
`(t)he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense." 427 U.S. at 109 [96 S.Ct. at 2400]
The Court explained that the proper test was whether the suppressed information creates a reasonable doubt of guilt that did not otherwise exist. The Agurs materiality test was further expanded in a 1985 case, where the court stated:
`The evidence is material only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' United States v. Bagley, 473 U.S. 667, 682 [105 S.Ct. 3375, 3383, 87 L.Ed.2d 481] (1985).
Applying the above standards, this court's findings are briefly summarized as to each item of evidence or information allegedly withheld by the prosecution:

"1. The transcript of the first murder trial of John Sweet, the State's chief witness.
"Even if the State had deliberately withheld the transcript, which is not this Court's finding, this evidence was legally immaterial. The testimony regarding Irene Maxcy's sexual misconduct would have been inadmissible for the purpose of impeaching John Sweet. Furthermore, defense counsel was aware of the allegations concerning Mrs. Maxcy. The testimony regarding the taped phone conversations was also immaterial. The defense possessed a copy of the transcript of Sweet's second trial which contained essentially the same information as the first trial, and Sweet's alleged statement to Irene Maxcy that he did not know a `William Kelley' is rendered irrelevant by Sweet's later testimony that he lied to the police about knowing the defendant.

"2. Latent Fingerprint Report
"The defendant never had actual physical possession of this report. However, the defense was aware, from the beginning of the trial, that none of the fingerprints matched the defendant's, and commented upon this fact during the closing argument. Moreover, John Sweet testified that the killer was wearing gloves at the time of the murder.

"3. A 1967 police report showing that a State's witness, Kaye Carter could not positively identify the defendant when shown a picture of him.
"From the testimony presented at the hearing, it appears likely that the defendant possessed a summary of the police *758 report which, unlike the original full report, did not contain the line about Ms. Carter's identification of the defendant's photograph. The court finds no evidence, however, that the State intentionally or knowingly withheld the original report. Also, this evidence, even if helpful to the defense, was not material. Ms. Carter did pick out the defendant's photograph in 1967 during an investigative interview with police. Moreover, she positively identified a photo of the defendant at Sweet's second trial. Ms. Carter was not asked to make a courtroom identification of the defendant during his trial.

"4. Crime scene photographs.
"No photographs were deliberately withheld from the defense. The four photos which the defendant alleges would have helped in his defense were not introduced in evidence at trial, but were available for the defendant's inspection upon request. At least one photograph shows what appears to be bloody footprints or smudge marks at the crime scene. This evidence is immaterial, because the three color photographs which were introduced depicted `a great deal of blood', as pointed out by Mr. Kunstler during cross examination. Even more important, the defense argument was contradicted by the testimony of J.C. Murdock, who stated that no bloody footprints were found.

"5. The fact that John Sweet received immunity in Massachusetts for his cooperation in the Maxcy case, among other things.
"The fact that John Sweet received immunity in both Florida and Massachusetts was well known by defense counsel. Sweet was extensively cross-examined by Mr. Edmund concerning the crimes for which he received immunity in Massachusetts. The court finds no evidence to support the inference that Sweet's Massachusetts immunity was contingent upon his testimony in the defendant's Florida trial.

"6. The prosecution, by agreement with John Sweet, precluded Roma Trulock from testifying at the defendant's trial.
"The court finds that there was no deal or agreement by the State not to call Roma Trulock, the primary investigating officer of the Maxcy murder. The defense could have called Mr. Trulock as a witness and, in fact, his name was included on the list of witnesses for the defense.
"To summarize the court's findings regarding the defendant's first claim, it agrees with the State that there were no Brady violations. The fingerprint report, the transcript of John Sweet's first trial, and the original 1967 police report were the only items of evidence which the defense did not possess or have access to. The results of the fingerprint report were known to the defense and utilized at trial. The alleged items of exculpatory testimony presented at Sweet's first trial were either known to defense counsel, admitted by Sweet at the defendant's trial, or irrelevant as not involving Sweet, and Kaye Carter's questionable identification of the defendant in 1967 was immaterial.

"II. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM
"In his next ground for relief, the defendant claims he was denied effective assistance of counsel. All such claims must be examined in light of the standard enunciated in Strickland v. Washington, 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984), where the court held that a determination must be made
`whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result.' 466 U.S. at 686 [104 S.Ct. at 3385-86.]
"The defendant has the burden of satisfying both parts of a two-prong test:
`First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a *759 trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.' 466 U.S. at 686 [104 S.Ct. at 3385-86.]
"This court, in reaching its findings, was mindful of the warning in Strickland to make every effort to eliminate the `distorting effects of hindsight' and to judge the conduct of both counsel from their perspectives at the time of the trial. In addition, the acts or omissions of counsel found to be based on reasonable professional judgment or trial strategy were not considered in support of this ineffectiveness claim. See Strickland, supra; Downs v. State, 453 So.2d 1102 (Fla. 1984); Songer v. State, 419 So.2d 1044 (Fla. 1982). The allegations and findings under this claim are also briefly stated:

"1. Counsel failed to thoroughly investigate the nature and quantity of the evidence destroyed and, therefore, failed to present a full and accurate representation to the court.
"This issue was presented to the court in a pretrial motion to dismiss and was substantially raised on appeal. Although there are some differences between the evidence listed in the instant Motion and that argued before the court in the Motion to Dismiss, those differences are immaterial. Claims previously raised on direct appeal cannot be raised under the guise of ineffective assistance of counsel in a collateral proceeding. See Sireci v. State, 469 So.2d 119 (Fla. 1985), cert. denied, 478 U.S. 1010 [106 S.Ct. 3308, 92 L.Ed.2d 721] (1986).

"2. Counsel failed to object to the testimony of the State's experts who presented scientific analysis of the destroyed evidence.
"No testimony was offered at the hearing in support of this claim. In any event, counsel were not ineffective for failing to object. J.C. Murdock and Heinrich Schmidt gave admissible testimony, and counsel stipulated to the testimony of James Halligan as a matter of trial strategy.

"3. Counsel failed to develop defense theories adequately. Specifically:

"Counsel failed to adduce evidence that the handwriting on the motel registration record was not the defendant's.
"The State never contended that the defendant himself signed `Mr. and Mrs. William Kelley' on the register. His companion may have signed.

"Counsel stipulated to the State's evidence linking the Mr. and Mrs. William Kelley registered at the Daytona Inn to the motor vehicle owned by Jennie Adams.
"The stipulation involved reasonable trial strategy. The State could, and did, present live testimony by Lt. John Kulik to establish this link.

"Counsel failed to point out the distinctions between the man at the Daytona Inn, as described by Kaye Carter, and the defendant.
"These discrepancies did emerge at trial. Ms. Carter related the description she gave to investigators in 1967, and later John Sweet described how the defendant looked at that time. Defense counsel had good reason not to attack the lack of a courtroom identification by Ms. Carter, because that would have allowed the State to bring out her previous identification at John Sweet's second trial.

"Counsel failed to investigate and utilize the inconsistencies in the time periods on the evening of the murder.
"There was no testimony offered on this issue. However, Mr. Edmund did comment on the time factor in his closing argument.

"Counsel failed to interview and call witnesses to testify regarding the defendant's physical characteristics in 1966.
"A review of the affidavits submitted by the defense shows how difficult height and weight estimates can be, even for those persons who allegedly knew the defendant at that time. The estimates are too varied to be of help.

"Counsel failed to obtain and present evidence (newspaper articles) which would explain the defendant's knowledge of the Maxcy killing when he was arrested.
"A review of the newspaper articles shows that they were extremely prejudicial *760 to the defendant and could have been redacted only with difficulty. The articles are of dubious admissibility since no testimony was presented that defendant read or was told of the articles. There were obvious tactical reasons for avoiding their use, since they would have engendered negative jury speculation. Moreover, the subject was touched upon during cross examination by the defense.

"Counsel failed to obtain affidavits and present testimony from three attorneys that the defendant contacted them to determine if there was a warrant for the defendant's arrest.
"A review of the file shows that Mr. Barry Haight, one of the attorneys, was listed as a potential defense witness. The court notes, furthermore, that this type of evidence produces a double-edged sword, and could have been quite damaging to the defense. Defense counsel could have reasonably believed that a jury would find the defendant's conduct in this regard inconsistent with that of a law-abiding citizen.

"4. Counsel presented evidence to the jury of the defendant's prior crimes, bad acts, and other prejudicial information.
"This was deliberate trial strategy on the part of defense counsel in an attempt to show that John Sweet had a motive to lie about the defendant and get back at him. The court notes that counsel did an excellent job of maligning John Sweet's character in the defendant's second trial. Even though the court was convinced that Sweet was telling the truth by the end of the trial, there were serious doubts that the jury would be so convinced.

"5. Counsel failed to object to a potentially coercive jury deadlock instruction.
"No testimony was presented on this issue. However, the argument was presented and rejected on direct appeal. See Sireci, supra.

"6. Counsel failed to adequately impeach John Sweet's credibility.
"The defense contends that, among other things, trial counsel failed to obtain a Massachusetts State Police Memorandum of 1977 concerning an investigation of Sweet's alleged criminal activities, and failed to object when the judge did not accommodate the jury's question about Sweet's immunity. The jury question issue was decided adversely to the defendant on appeal. See Sireci, supra. Furthermore, the court finds that counsel adequately impeached John Sweet. A review of the trial transcript shows that Sweet was rigorously cross-examined by defense counsel, who was able to uncover numerous incidents where Sweet received immunity for serious crimes and committed perjury. The additional areas of contradictory testimony referred to in the defendant's memorandum in support of this Motion would not have affected the outcome of the trial.

"7. Counsel failed to move for a change of venue.
"Both defense attorneys testified that the venue matter was discussed and rejected for strategic reasons. In addition, a review of the voir dire shows that there was no problem in seating a jury in Highlands County. This may have been due to the fact that Highlands County has experienced an explosive population growth, mostly due to a recent influx of retirees. Consequently, a large number of jurors did not live in the county at the time of the murder in 1966. Mr. Edmund also testified that the decision to waive alternates was a matter of trial tactics. No jurors became incapacitated. The court also notes that the defense used much less than the number of peremptory challenges allowed.

"THE TESTIMONY OF THE ATTORNEYS
"The unsigned affidavit of Mr. Edmund (attached to the instant Motion as Exhibit R-1) was not admitted in evidence at the hearing. The proposed affidavit resulted from an interview between investigator Marc Nezer and Mr. Edmund which lasted only about thirty minutes and was followed by a few telephone conversations of short duration. The affidavit itself was later prepared by two attorneys who had never met with Mr. Edmund, and was quite detailed considering the short length of the interview. It is more than likely, therefore, *761 that the two attorneys who prepared the affidavit characterized Mr. Edmund's trial conduct inaccurately. In any event, Mr. Edmund chose not to sign this document, and instead prepared and signed an affidavit which he felt more closely portrayed his trial conduct. The defendant's claim that this affidavit represents what Mr. Edmund told Mr. Nezer at the interview is rejected insofar as it differs from the affidavit signed by Mr. Edmund.
"Both trial counsel testified at the hearing that they made mistakes during the trial, and would have approached certain matters differently given another chance. As the State correctly pointed out, an attorney's own admission that he or she was ineffective is of little persuasion in these proceedings. See Johnson v. Wainwright, 463 So.2d 207 (Fla. 1985); Francis v. State, [529 So.2d 670] No. 71,443 (Fla. June 2, 1988) [13 FLW 369]. The court is also cognizant of the need to avoid the distorting effects of hindsight, and defer to the strong presumption in favor of effectiveness.
"But most important, this court, as trial court, observed the actions and conduct of both defense attorneys in the course of the two trials, and found their representation of the defendant to be capable and effective. The court does recognize that Mr. Edmund and Mr. Kunstler disagreed at the hearing in regard to which attorney acted as lead counsel at trial and other matters. Mr. Kunstler has strong feelings against the death penalty. Apparently those feelings have affected his perception of the attorneys' actions at the trial. However, he conveniently finds the greatest fault to be with co-counsel, not himself. He remained silent at trial and for four years thereafter. A large part of his testimony is not credible. Based on demeanor, and the court's own observations in the courtroom, the court accepts Mr. Edmund's version insofar as any conflict exists.
"After careful consideration, the court now finds that none of the acts or omissions complained of in the defendant's motion rises to the level of ineffective assistance of counsel.
"While on the witness stand, Mr. Edmund expressed his belief in the unfairness of imposing the death penalty in a case such as this, where much of the physical evidence was destroyed prior to trial. The issue of the destroyed evidence was raised on appeal and rejected by the Florida Supreme Court in Kelley v. State, 486 So.2d 578 (Fla. 1986). This court is aware of the argument that `death is different', and therefore errors of a fundamental constitutional nature should be cognizable in a 3.850 proceeding, even though they were, or should have been, raised on appeal. However, the law in Florida clearly mandates that the same rules apply in capital cases as in non capital cases, at least in regard to the procedural bar. Spenkelink v. State, 350 So.2d 85 (Fla. 1977) (England, J., concurring).
"In summary, the court finds that there were no Brady violations committed by the State, nor was there the slightest hint of prosecutorial misconduct. In addition, both defense counsel effectively represented the defendant.
"As a final comment, the court, who conducted the trial also, notes that at the close of the hearing, it was left with a strong conviction that the defendant is guilty of the crime charged, that he received a fair trial, and that justice was done in this case. It is therefore
"ORDERED AND ADJUDGED that defendant's Motion to Vacate Judgment of Conviction and Set Aside Sentence of Death is denied.
"DONE AND ORDERED at Bartow, Florida, this 11th day of August, 1988."
There was competent substantial evidence to support the conclusion that there was no Brady violation and that defense counsel was not ineffective. Further, even if the defense had had in its possession the items it claimed it should have had, it is clear that the result of the trial would not have probably been different.
While the order denying the motion for postconviction relief was on appeal, Kelley filed a motion to interview the jurors who sat on his original trial. He asserted *762 that two attorneys had recently reported that one of the jurors told them of certain misconduct by another juror during the course of the trial. This Court relinquished jurisdiction to permit the judge to interview the jurors. The judge conducted a hearing in which all twelve jurors were interviewed together with the two attorneys who had reported the incident. The accusing juror backed off some of the accusatory statements attributed to him by the attorneys but continued to maintain that another juror told him that she had read a newspaper during the trial which reported that Kelley had a large sum of money in his possession when he was arrested. The accused juror emphatically denied having watched, read, or listened to any media account of the case or the defendant. She said she knew of no one on the jury bringing in any kind of outside information either by newspaper or any other source. She also denied the conversation testified to by the accusing juror. None of the remaining jurors were aware of any outside information having come to the attention of the jury.
In light of the conflicting evidence, the judge's finding of no juror misconduct must be sustained. We also agree that the judge properly refused to inquire into the assertions that the accused juror also may have been playing tic-tac-toe and may have changed her vote in order to meet a social engagement on the ground that such matters inhered in the verdict.
Finally, we reject Kelley's contention that the judge erred in denying the motion to recuse which was filed shortly before the jury interview. The asserted grounds did not set forth a legal basis for recusal.
We affirm the order denying Kelley's motion for postconviction relief.
It is so ordered.
SHAW, C.J., and OVERTON, EHRLICH and GRIMES, JJ., concur.
BARKETT and KOGAN, JJ., concur in result only.
McDONALD, J., recused.