William H. KELLEY, Petitioner,

v.

Harry SINGLETARY, Secretary, Florida Department of Corrections, Respondent.

No. 92–14246CIV.

United States District Court, S.D. Florida.

Sept. 19, 2002.

Laurence H. Tribe—Cambridge, MA, Barry P. Wilson—Boston, MA, James C. Lohman—New Orleans, LA, for Petitioner.

Robert J. Krauss, Carol Ditmar—Assistant Attorney General, Tampa, FL, for Respondents.

### ORDER

ROETTGER, District Judge.

**THIS CAUSE** is before the Court upon a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is William H. Kelley (Kelley), and Respondent is Harry Singletary, Secretary of the Department of Corrections for the State of Florida (State). This Court previously entered a partial order on August 31, 2000 denying claims 4, 5, and 6 of the petition. The Court reserved ruling on the first three claims as Kelley had requested to present more evidence in an evidentiary hearing. The Court held an evidentiary hearing in Boston, Massachusetts on April 24–25, 2001 and in Ft. Pierce, Florida on July 9, 2001. Final briefs were filed with the Court and a final argument was held on November 7, 2001 in Ft. Lauderdale, Florida.

### FACTS

Irene Maxcy and John Sweet were lovers, and they planned to kill Irene's husband, Charles von Maxcy, a wealthy citrus grover and rancher from Sebring, Florida. Sweet and Irene talked for months about the murder, after which they planned to live together on Maxcy's large estate. Sweet contacted an acquaintance, William Bennett of Boston, Massachusetts. Arrangements were made, and a price was set: $5000 up front, and $15,000 after the murder.

On October 1, 1966, Sweet went to Daytona, Florida to meet Andrew von Etter. Von Etter was to do the killing, along with a partner. The next day von Etter called Sweet to tell him the partner, "William Kelley", had arrived. On October 3rd Sweet drove von Etter and "Kelley" to the estate. The alleged killers showed Sweet the weapons they would use, knives and a revolver, which they kept in a satchel. Sweet drove back to Sebring. Charles von Maxcy was murdered that day. A couple weeks later, Sweet went to Boston to pay the $15,000 balance due for the murder.

Unfortunately, the murder did not signal the beginning of a blissful life on the estate for Irene Maxcy and John Sweet. Sweet wanted more money, purportedly to pay off the murder balance, and he began to harass and threaten Irene and her five-year-old daughter daily. Terrified, Irene Maxcy went to the authorities. In exchange for immunity, she implicated Sweet in the murder-for-hire scheme. Sweet was arrested in 1967, charged with first degree murder. It became known in the course of

the investigation for Sweet's trial that the "triggermen" in the murder were named von Etter and "Kelley". These men were not charged at this time, however, as prosecutors felt they had insufficient evidence against them.

Irene Maxcy was the star witness for the prosecution in Sweet's first trial. Her testimony was erratic and difficult as she denied, even under the protection of immunity, that she wanted to kill her husband. She testified it was entirely Sweet's idea. She claimed to have witnessed many of the phone calls Sweet had made in arranging the murder, and she related many of the details about which Sweet had kept her informed, including the murder itself. She further testified that she gave Sweet more than $35,000 to help pay for the murder, and that Sweet had wanted another $75,000. Sweet, testifying on his own behalf, denied any involvement in the crime. The trial ended in a hung jury. Sweet was tried again in 1968. Again, Irene Maxcy testified against him, and again, Sweet denied any involvement. This time the jury agreed on a guilty verdict.

The Second District Court of Appeal of Florida reversed Sweet's conviction. *Sweet v. State*, 235 So.2d 40 (Fla.2d D.C.A. 1970). The court of appeal held that the trial court erred in not admitting Irene Maxcy's testimony that she had been having a romantic relationship with the case agent. The case agent denied having this relationship. But these conflicting accounts, in conjunction with the unseemliness of the relationship to begin with, were found to undermine the credibility of both Irene Maxcy and the case agent.[1] As this testimony formed the vital foundation of the case, the court of appeal, one judge dissenting, ordered a reversal. *See id.* at 42.

Sweet was not tried a third time. By 1971 the State had given up on the case. Five years later, in 1976, most of the physical evidence was destroyed at the behest of the clerk of court, who had been charged with storing the case file and the evidence. The State allowed the destruction of the physical evidence—which included a bullet, a bloody bedsheet, and a shred of the victim's shirt—on the basis that the case "had been disposed of."

By 1981 John Sweet was facing criminal charges in Massachusetts of prostitution, narcotics distribution, arson, bribery, counterfeiting, loan sharking, and hijacking. With authorities closing in on him Sweet went to them first. His plan was to win immunity in exchange for information he had on the murder of Charles von Maxcy. William Kelley was the target, as Sweet implicated him as one of the murderers.[2] The Massachusetts authorities brought Sweet to Florida where Sweet gave authorities there his confession. The next day Sweet was awarded immunity in Massachusetts.

A Florida grand jury indicted William Kelley on first degree murder charges in December, 1981—some fifteen years after the murder. Kelley was arrested in 1983. His first trial, like Sweet's, ended in a hung jury and a mistrial. Kelley was retried in March of 1984. For both trials the primary evidence against Kelley was Sweet's testimony. Again, Sweet recounted the details of the murder, how it was arranged, and who was involved. Corroborating Sweet's accusations, the State presented evidence that a "Mr. and Mrs. William Kelley" had registered at the Daytona

---

**1.** Irene Maxcy was indeed convicted of perjury in 1971 in connection with her testimony in the Sweet trial. She was sentenced to life imprisonment, but served only four and one-half years before being released on parole.

**2.** By 1981 von Etter and Bennett were dead.

Inn the night before the murder. Also, the jury heard from Abe Namia, a private investigator hired by Sweet's attorney shortly after Sweet's 1967 arrest. Namia testified about statements Sweet had purportedly made which incriminated Kelley. The jury returned a guilty verdict against Kelley in March, 1984.

The jury then reconvened to hear evidence pertaining to Kelley's sentence. After weighing the aggravating factors against the mitigating factors suggested by this evidence, the jury recommended death. In April, the presiding judge followed the recommendation, and formally sentenced Kelley to death. The judge found three statutory aggravating circumstances justifying the sentence: prior conviction of a prior felony, homicide committed for pecuniary gain, and homicide committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. *See* Fla. Stat. Ch. 921.141. The court indicated one mitigating factor: Kelley was the only one, out of at least five, to receive punishment for Charles von Maxcy's murder.

### APPEALS

On direct appeal to the Supreme Court of Florida, Kelley argued eight issues, challenging both his conviction and his death sentence. *See Kelley v. State of Florida,* 486 So.2d 578 (Fla.1986). Kelley claimed the destruction of evidence irreparably prejudiced him, the testimony of the private investigator, Abe Namia, was improperly admitted hearsay, the trial court erred in not answering a jury question during its deliberation, the trial court erred in allowing the jurors to take notes, certain post-arrest statements should not have been admitted, and the trial judge erred giving non-pattern instructions to the jury after the jury reported it was deadlocked. The Supreme Court of Florida rejected each of these claims. It did not consider Kelley's ineffective assistance of counsel claim, as this was Kelley's direct appeal, and the court further rejected Kelley's attack on his death sentence as "without merit." Accordingly, the Supreme Court of Florida affirmed Kelley's conviction and sentence. *See id.* at 580–86. Kelley sought certiorari in the United States Supreme Court; the Court denied this petition on October 6, 1986. *See Kelley v. Florida,* 479 U.S. 871, 107 S.Ct. 244, 93 L.Ed.2d 169 (1986).

Kelley filed his post-conviction relief motion to vacate the judgment and sentence pursuant to rule 3.850 of the Florida Rules of Criminal Procedure in the Tenth Judicial Circuit of Florida in November, 1987. After a hearing the court denied the motion in August, 1988; Kelley appealed the denial, again to the Supreme Court of Florida. *See Kelley v. State,* 569 So.2d 754 (Fla.1990). As his first point of collateral relief, Kelley repeated his argument that the destruction of evidence impaired his due process rights. The court rejected this claim on much the same grounds as it did on direct appeal. The court denied two other claims: the purported improper contact by the prosecution of a witness and an improper closing argument, as procedurally barred. Further, Kelley argued more extensively that there were *Brady* violations, and averred a detailed list of supposed instances of ineffective assistance of counsel. The Supreme Court of Florida deferred entirely to the trial court's order on all of these claims, and concluded there was neither a *Brady* violation, nor ineffective assistance of counsel. Kelley's other claims of juror misconduct, and error in the trial judge's decision not to recuse himself from the case, were likewise found unavailing. *See id.* at 755–62. The Supreme Court of Florida affirmed the trial court's denial of Kelley's motion to vacate the judgment and sentence on September 6, 1990.

Kelley filed a petition of habeas corpus in the Supreme Court of Florida in April, 1991. Kelley raised another claim of ineffective assistance of counsel, this time directed at his appellate counsel. Kelley further attacked the constitutionality of applying Florida's death penalty statute to this case on *ex post facto* grounds, and challenged the aggravating factors found in this case as "overbroad." The Supreme Court of Florida denied Kelley's petition on March 12, 1992. *Kelley v. Dugger*, 597 So.2d 262 (Fla.1992).

## FEDERAL HABEAS CORPUS PETITION

Kelley filed the instant petition for habeas corpus in this court, pursuant to 28 U.S.C. § 2254, on October 9, 1992. Kelley alleges six claims. The first presents prosecutorial misconduct, including suppression of exculpatory evidence, and making false statements to the jury. Claim two alleges ineffective assistance of counsel, as defense counsel failed to investigate the case, depose witnesses, and perform other basic functions. Third, Kelley claims the destruction of evidence violated his constitutional rights. Claims 4, 5, and 6 were denied by this Court on August 31, 2000.

## THE AEDPA

█ One preliminary matter involves the law which this court should apply to Kelley's petition. The habeas corpus statute under which Kelley filed this action underwent significant changes in 1996, pursuant to the Antiterrorism and Effective Death Penalty Act (AEDPA). Substantively, the amended § 2254 provides for much greater deference to the state court adjudication of claims, and further refines the presumption of correctness federal courts must accord factual determinations in state court. *See* 28 U.S.C. § 2254(d), (e). With regards to Kelley's petition, the United States Supreme Court

has held that in general, except for select provisions that Congress explicitly made retroactive, the amendments apply only to cases filed after the effective date of the amended statute. *See Lindh v. Murphy*, 521 U.S. 320, 326–37, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). As Kelley's petition was filed in 1992, and does not concern the select retroactive provisions, this court must apply the law as it was prior to the 1996 amendments.

## ANALYSIS

Pursuant to the Supreme Court's ruling in *Lindh*, this court must analyze Kelley's claim under the pre-AEDPA standard of review for habeas petitions. Under the old law, a petition for a writ of habeas corpus cannot be granted unless Kelley can establish that he is being held in violation of the United States Constitution or the laws or treaties of the United States. 28 U.S.C. § 2254(a). In his petition for writ of habeas corpus, Kelley claims a *Brady* violation. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Because a *Brady* claim is in fact a due process claim, it is clear that this Court is empowered under the appropriate circumstances to grant federal habeas corpus relief "on the ground that [the petitioner] is in custody in violation of the Constitution ... of the United States." 28 U.S.C. § 2254(a). The *Brady* rule does not require a prosecutor to "deliver his entire file to defense counsel," but only to disclose those items which are material to the defendant's guilt or punishment. *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 87 L.Ed.2d 481, (1985); accord, e.g., *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) ("We have never held that the Constitution demands an open file policy.")

"There are three components of a true *Brady* violation: [1] The evidence at issue

must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). The second component (suppression) is not at issue in this case, since the State does not dispute that the evidence in question was not produced to Kelley's counsel before trial. The remaining two issues depend on whether the undisclosed information was material and exculpatory.

The United States Supreme Court has emphasized four aspects of materiality in *Kyles v. Whitley*. First,

[a]lthough the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant) .... *Bagley's* touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." ....

The second aspect of *Bagley* materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence

in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. [footnote omitted] ....

Third ... once a reviewing court applying *Bagley* has found constitutional error there is no need for further harmless-error review ....

The fourth and final aspect of *Bagley* materiality to be stressed here is its definition in terms of suppressed evidence considered collectively, not item by item. [footnote omitted].

*Kyles v. Whitley*, 514 U.S. at 434–36, 115 S.Ct. 1555 (most citations and footnotes omitted).

It is against this legal backdrop that Kelley's trial must be viewed. Petitioner made his *Brady* violation claims at the state level both in a November 1987 motion for post-conviction relief under Rule 3.850 of the Florida Rules of Criminal Procedure and again with the Florida Supreme Court. The Florida Supreme Court, quoting the trial court's order, issued one paragraph explanations for each exculpatory and impeachment evidence that the state failed to turn over to the defense. Therefore, the record before this Court contains only the trial court's reasoning, analysis, findings of fact, and legal bases for the denial of Kelley's *Brady* violation claim.

The trial court, quoted by the Florida Supreme Court, "briefly summarized" each piece of evidence for its likely individual effect on the outcome of the trial, but did

not analyze the evidence collectively. This piecemeal approach is contrary to the progeny of *Brady*. Therefore, this court must independently consider the merits of Kelley's claims. *Kyles, supra.*

Kelley claims the State of Florida deprived defense counsel of valuable impeachment evidence by suppressing evidence of Sweet's true immunity deal, the transcript of John Sweet's first trial, a police report which recorded Kaye Carter's (the motel clerk) inability to positively identify a picture of Kelley shortly after the murder, and a latent fingerprint report. Kelley made numerous pretrial requests for such materials, including detailed motions, legal memoranda, and substantial correspondence. These undisclosed exculpatory materials were not provided to Kelley prior to his trial and were only furnished during his post conviction 3.850 proceedings, pursuant to his request for prosecution and investigative files under Florida's "Public Records Act," Chapter 119, Fla. Stat. Kelley's trial attorneys were not aware of the existence of these material exculpatory documents and records until they were turned over by the prosecution at the 3.850 hearing.

In *Kelley v. State of Florida*, Justice Adkins of the Florida Supreme Court wrote "we wish to emphasize, however, that if even the slightest hint of prosecutorial misconduct was present in the case the result might well be different." *Kelley v. State*, 486 So.2d at 582. This case presents many incidences of prosecutorial misconduct. Hardy Pickard, Assistant State Attorney, has a habit of failing to turn over exculpatory and impeachment evidence.[3]

■ A key piece of evidence withheld from Kelley by Assistant State Attorney Pickard was information concerning Sweet's Massachusetts immunity agreement. The State withheld two documents that proved Sweet had a deal for immunity on numerous serious felonies in Massachusetts which were inextricably connected to Sweet's implication of Kelley in the murder of Maxcy. The first suppressed document revealed that Sweet was not awarded immunity from Massachusetts until March 13, 1981—after an off-the-record debriefing of Sweet and negotiations with Massachusetts officials concerning the Maxcy murder and numerous Massachusetts crimes. (Order of Immunity dated March 13, 1981).

In addition, the State and Pickard failed to disclose to defense counsel Agent Joe Mitchell's Florida Department of Law Enforcement Investigative Report dated February 21, 1981. This report was withheld from Kelley until years after his trial. The document describes a meeting on March 6, 1981 at Pickard's office in Bartow, Florida. The document describes the sequence of events and the descriptions of the inter-state meetings and discussions with Sweet and his attorneys. In the report, "Major Regan had indicated that Sweet was willing to testify in behalf of the State of Florida, providing he could be granted immunity in the 1966 case." (Florida Department of Law Enforcement, Investigative Report dated February 21, 1981, p. 1). The document is important because what is contained in the document is vastly at odds with the state's representation during the trial. During the State's closing argument, Pickard argued to the jury that Sweet did not have to give Kelley to the authorities in order to get immunity. However, it is clear from the withheld

---

**3.** In another capital murder case, Circuit Judge Barbara Fleischer, sitting by designation by the Florida Supreme Court as a temporary judge of the Tenth Circuit, ordered a new trial for a defendant because Assistant State Attorney Hardy Pickard withheld impeachment materials from the defense. *State of Florida v. Melendez*, No: CF–84–1016A2–XX (Tenth Judicial Circuit of Florida), slip op., filed December 5, 2001.

report that Sweet was willing to testify *if* he could be granted immunity. (Emphasis supplied).

As in Kelley's first murder trial, the materiality of Sweet's deal is evident because the jury in the second trial sent the trial court the following question during its deliberation:

> As the Jury, we would like to know if John J. Sweet received immunity in Florida for the first degree murder and perjury before he gave information on the Maxcy trial, and if he had anything to gain by his testimony. (Excerpt from Kelley's second trial transcript, p. 925).

Clearly, the jury was vitally interested in Sweet's motivation for testifying as he did. If Sweet had nothing to gain from his testimony, his testimony would be more credible. On the other hand, if Sweet did have anything to gain by his testimony, his testimony would be more suspect.

If counsel had been provided a copy of the report, counsel would have been placed in a better situation to cross-examine Sweet. *See Stano v. Dugger*, 901 F.2d 898, 903 (11th Cir.1990)(en banc)(noting that the defendant's burden to prove the materiality of suppressed impeachment evidence was lightened in view of the fact that a previous jury had been unable to find the defendant guilty). Worse still, during the jury's deliberations the prosecutor, Pickard, to this question argued successfully to the trial judge that he not read Sweet's testimony back to the jury.[4] The trial judge brought the jury back into the courtroom and explained that the court could not answer the question and could not comment on the evidence.

Disclosure of the memo to Kelley's counsel was required under *Brady*. As in this case, where a prosecution depends almost entirely on the testimony of one witness, without whom there would be no indictment or evidence to carry the case to the jury, the reliability and credibility of that witness is a monumentally important issue and may well have been determinative of guilt or innocence of the defendant. *Giglio v. United States*, 405 U.S. 150, 154–55, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). Evidence of any understanding or agreement as to a future prosecution would be relevant to the credibility of that witness and a jury is entitled to know of it, especially when they specifically ask about it during their deliberations. *Id.* Kelley, defense counsel, and the jury should have been informed of the manner in which Sweet was granted immunity in Florida and Massachusetts, and the manner in which both states worked together to secure Sweet's cooperation. The jury's question to the trial court shows that the jury was very concerned with this matter and full disclosure of the immunity could well have changed the outcome of Kelley's trial.

■ The second piece of evidence withheld from Kelley is the transcript of Sweet's first trial from 1967. Kelley's attorneys made numerous pretrial requests for the transcripts of Sweet's first trial from 1967. The state court ordered the state to provide the defense with a copy of Sweet's first trial.[5] However, the transcript was never provided to Kelley prior to his murder trial. The transcript would have assisted Kelley in a number of ways. The transcript contained almost three hundred pages of Sweet's testimony. This pri-

---

**4.** At Kelley's first trial, when confronted with a remarkably similar question, the trial court had all of Sweet's testimony re-read to the jury.

**5.** On June 29, 1983, Circuit Court Judge J. McDonald, who was later appointed to the Florida Supreme Court and recused himself from Kelley's appeal to the Florida Supreme Court, granted Kelley's Motion for Copies of Sweet's first trial transcripts.

or testimony would have been valuable in impeaching Sweet.

The first trial transcript was material because it would have provided sworn testimony for impeachment of Sweet, including whether he lied about Irene Maxcy's sexual conduct to discredit her and save himself and whether he told Irene Maxcy that he did not know a "William Kelley".

At Sweet's first trial, Sweet testified that Irene Maxcy (1) had a sexual affair with a young boy (Excerpt from Sweet's first trial transcript, p. 1075–78); (2) arranged for, in Sweet's presence, and then engaged in sex with a friend of Sweet's (*Id.* at 1079–82); and (3) engaged in sex with a dog, purchased for her by Sweet (*Id.* at 1083–87). The jury would have thought carefully about the credibility of a man who made such allegations about a woman he claimed to love.

Next, Sweet's first trial transcript contained testimony of important tape-recorded telephone conversations between Irene Maxcy and Sweet. In Sweet's first trial, Sweet testified that Irene Maxcy assured him that the telephone was not bugged and that he believed her (*Id.* at 828–29, 846). Irene Maxcy, who was being urged repeatedly by investigators to obtain a statement from Sweet (*Id.* at 139), begged Sweet to work a deal with the police by framing someone in the Maxcy murder (*Id.* at 829). Irene Maxcy suggested names, one of which was "William Kelley" (*Id.* at 829, 1129). Sweet replied that he did not know a "William Kelley" (*Id.*). This exculpatory statement did not come out at the second Sweet trial. Kelley's jury would have had a much stronger doubt that Sweet was telling the truth if defense counsel had impeached Sweet with the information of not knowing a "William Kelley" which was only available from Sweet's first trial transcript.

Assistant State Attorney Pickard's failure to turn over Sweet's first trial transcript deprived Kelley and his counsel of material exculpatory evidence. Access to the transcript of Sweet's first trial could reasonably have changed the outcome of Kelley's trial. Without the transcript defense counsel was inhibited from full cross-examination of the veracity of the state's single key prosecution witness, Sweet. Kelley's trial was dependent almost entirely upon the testimony of Sweet. Sweet's first trial transcript was impeachment evidence which Kelley's counsel could have used to discredit Sweet or question his veracity. Because the state's case stood or fell on Sweet's credibility, Kelley had a right to impeach Sweet fully. Kelley was unable to impeach Sweet fully because Assistant State Attorney Pickard failed to disclose Sweet's first trial transcript. The failure to disclose the transcript served to eliminate from his trial impeachment evidence that was crucial to the jury's assessment of Sweet's reliability and credibility as a witness. Had the transcript been available to Kelley and his counsel there is a reasonable likelihood that the outcome of Kelley's trial would have been different.

■ Third, the state withheld a second *police report, perhaps more critical to Kelley,* concerning the description of the "William Kelley" Kaye Carter met at the Daytona Inn Motel. The state did provide a report to defense counsel during pretrial. In the disclosed report, Carter described "William Kelley" at the hotel:

> ... as being about 40, 6′ to 6′2″ tall, medium build, dark hair, (kind of curly) with a deep husky voice. (Florida Sheriffs Bureau Report dated March 17, 1967).

In the withheld report Carter described "William Kelley":

> ... as being about 40, 6′ medium build, dark hair, kind of curly, husky voice. This picture of William Harold Kelley looks something like him although she is

sure that he was older than the 26 years on his description. (Florida Sheriffs Bureau Report dated March 18, 1967).

The description given of "William Kelley" by Carter in both reports is substantially different from Petitioner Kelley.[6] Petitioner Kelley on October 3, 1966 was a young looking 23-year old, with straight blond hair, and was at least six feet five inches tall.

There are three exculpatory evidence points in the undisclosed report. First, in the undisclosed report, Kelley is described as six feet tall, as opposed to six feet to six feet two inches in the disclosed report. Since Petitioner Kelley is at least six feet five inches tall, the three to five inch difference between the two reports is more probative that Carter's "William Kelley" and the Petitioner Kelley were two different individuals.

Second, Carter was "sure" that Kelley was older than 26 years old. On October 3, 1966 Kelley was twenty-three years old and therefore Carter would be even *more* sure that he was older than *twenty-three*. (Emphasis supplied).

And third, it appears there was an attempted photo identification by Carter. Carter's statement that the picture looked "something like" someone is not a positive identification, especially when Carter was "sure" that "William Kelley" was older. Kelley was entitled to know of this failed identification. Clearly, if defense counsel had been in possession of the undisclosed police report, counsel would have been in a better position to cross-examine Carter

concerning the actual negative photographic identification, something far more exculpatory than the information contained in the disclosed report. The suppression of the report violated Kelley's constitution right and prejudiced his defense.

▇ Lastly, the state withheld a fingerprint report. (Florida Sheriff's Bureau Latent Fingerprint Report dated September 1, 1967). The report contained the result of comparing latent lifts from the Maxcy house and car to various persons. Kelley's prints did not match any of the lifted fingerprints. The trial court concluded that the defense counsel was aware of the lifting of the fingerprints by the comments counsel made during trial. However, commenting that Kelley's fingerprints were nowhere to be found in the criminal investigation is not the same as being able to present a report to the jury stating such an absence of Kelley's prints. Defense counsel's possession of the actual fingerprint report would have enabled them to make inquiries as to the comparisons of the latent lifts to other suspects. Thus, all of the information in the fingerprint report would have been material and exculpatory and the fingerprint report could have been used to "finger" another suspect.

The Court finds that the Florida Supreme Court improperly concluded that "there was no Brady violation" by the State of Florida's depriving defense counsel of valuable impeachment evidence. While the Florida Supreme Court recited the correct law, it does not appear that it

---

**6.** Carter's description is particularly significant in that the petitioner and respondent have stipulated that in 1966 Steve Busias was in his mid- to later thirties but looked older, was about 6' to 6'2", had dark curly hair, and had a deep husky voice.

In hearings before this Court, Charles Busias, son of Steve Busias, testified that his father had come to Florida about the time of

the murder and shortly after returned to Boston and had enough cash to buy a car and a lounge.

Another witness, Hobart Willis, testified in the Boston hearing that Steve Busias admitted to Maxcy's murder. In Willis' affidavit, Willis stated Steve Busias admitted also to having von Etter killed.

properly applied that law to the facts of the case when it stated "even if the defense had had in its possession the items it claimed it should have had, it is clear that the result of the trial would not have probably been different." *Kelley v. State,* 569 So.2d at 761.

■ The Florida Supreme Court's opinion includes references stating that certain evidence was not material. This suggests that "cumulative materiality" was not the touchstone of the Florida Supreme Court's opinion but rather it was a series of independent materiality evaluations, contrary to the requirements of *Bagley.* See *Kyles v. Whitley,* 514 U.S. at 436, 115 S.Ct. 1555. Disclosure of the suppressed evidence to competent counsel would have made a different result much more probable. The essence of the State's case was the testimony of Sweet. Disclosure of his immunity and transcript from his first trial would have resulted in a markedly weaker case for the prosecution and a markedly stronger one for the defense.

For the reasons set forth above, upon consideration of the petition, the evidentiary hearing, the record, and because the state failed to disclose materially exculpatory evidence as required by *Brady* and its progeny, thus undermining confidence in the outcome of Kelley's trial.

Therefore, it is **ORDERED AND ADJUDGED** that the petition for habeas corpus pursuant to 28 U.S.C. § 2254 is **GRANTED.** Petitioner's conviction is **REVERSED,** and a new trial is ordered.[7]

---

7. The undersigned judge is not a foe of capital punishment and has granted only three § 2254's in thirty-plus years on the District Court bench.