909 So.2d 448 (2005)
STATE of Florida, Appellant,
v.
Claudia MURO, Appellee.
No. 4D04-4302.
District Court of Appeal of Florida, Fourth District.
August 24, 2005.
*449 Charles J. Crist, Jr., Attorney General, Tallahassee, and August A. Bonavita, Assistant Attorney General, West Palm Beach, for appellant.
Ramona L. Tolley of Ramona L. Tolley, P.A., Fort Lauderdale, for appellee.
PER CURIAM.
The State appeals the trial court's order granting Claudia Muro's motion to suppress a videotape which contains footage recorded by a "nanny cam." Muro's motion to suppress alleges that her due process rights were violated because law enforcement preserved only two of eighty hours of recording and the seventy-eight hours of recording not collected or preserved potentially contained exculpatory evidence. We reverse.
Muro was charged with eight counts of child abuse of a child for whom she served as a nanny. One of the counts, which is the focus of this appeal, was for an incident in which Muro allegedly forcibly shook the child. The incident was allegedly recorded by a "nanny cam."
The child's father became suspicious of Muro when he discovered a bruise on his daughter's thigh and observed his daughter begin to cry every time she was near Muro. As a result, he installed a "nanny cam" to monitor Muro's interaction with his daughter. As the trial court summarized in its suppression order, the "nanny cam" operated in the following fashion:
After Defendant was hired, the [father] had a "nanny cam" installed. The device is a digital recorder, ("DVR") with four cameras attached. It operates much like a VCR, but instead of recording to a tape, it records to a hard drive. The device has the capability of recording fourteen days, but once the hard drive is full, it starts over and begins taping over itself. The device is based on a motion detection system that can record data from all four cameras simultaneously. If the motion detector senses any movement, which could be as slight as a cat moving through the room, the camera begins recording. If there is slight movement in all four rooms where the cameras are installed, then all four cameras would be recording at the same time, but if there is movement in only one room, only one camera would be recording. As explained to this Court, if one camera is recording, the image seen by the viewer is 30 frames per second, which is what the human eye is capable of seeing, so the image appears fluid. However, if two of the cameras are recording at the same time, the frames per second are split, and there are only 15 frames per second. Further, if all four cameras are in operation, the resolution is 7.5 frames per second. As explained by both the State and the Defense experts, this does not change the real time of the video, but it could change the appearance of the playback. The State's expert testified the video would look more "jumpy" at 7.5 frames per second. The best explanation given to this Court is the example of a cartoon. If there are 30 frames in the cartoon, the movements of the characters are much more fluid than if there were only 7.5 frames.
*450 Upon returning from work one day, the father discovered a bruise on his daughter's face. The father and mother then played back the day's "nanny cam" recording on a television and viewed Muro allegedly shaking their daughter. The father used a camcorder to tape the television screen as the incident played. The father and mother then took their daughter to the emergency room and contacted law enforcement. Following numerous examinations, no injuries were found on the child. A detective spoke with the father and mother at the hospital, viewed the footage on the camcorder, and arrested Muro for child abuse.
Thereafter, law enforcement sought to retrieve the hard drive, which contained the original recording of the incident, from the "nanny cam." The father refused to turn over the hard drive to law enforcement due to the fact the recording would also show private and intimate activities of the father and mother. As a result, a law enforcement technician visited the family's home, connected a camcorder to the "nanny cam," and copied several minutes of recording surrounding each suspicious incident, including the shaking incident, pointed out by the father and mother. The technician copied approximately two hours of tape out of the eighty hours that Muro spent with the child during the fourteen-day recording cycle.
The father allowed the "nanny cam" to continue recording after the technician finished, because he testified that he was not instructed by law enforcement to turn it off. The law enforcement technician agreed that he did not instruct the father to turn off the "nanny cam." As a result, due to the fourteen-day recording cycle, the original recording of the incident in question and related computer data was erased from the "nanny cam" hard drive. As such, the only remaining recording is the two hours of tape produced by the law enforcement technician.
Muro filed a motion to suppress the videotape produced by the law enforcement technician, alleging, inter alia, that her due process rights were violated because the videotape does not provide a fair and accurate depiction of events. Muro asserted that it was vital for law enforcement to have retained the other seventy-eight hours of tape in which Muro appeared because such might demonstrate that Muro was loving and caring toward the child. Additionally, Muro contended that the original recording should have been preserved because it cannot be ascertained whether Muro's actions were volitional or rather the result of frame rate changes that cannot be determined from the law enforcement technician's videotape. The State responded that Muro's concerns were a matter of the weight rather than the admissibility of the evidence.
At a hearing on the motion to suppress, the law enforcement technician and detective assigned to the case testified that standard operating procedure is not to retrieve an entire surveillance tape but only the footage of the incident and its surrounding context. The detective indicated that some of the surrounding footage did depict Muro playing with the child in a gentle manner. A defense expert testified that the frame rate that the "nanny cam" was recording at could have been fluctuating throughout the entire recording based on the number of cameras operating, and that such could have been ascertained by viewing the original playback from the "nanny cam" hard drive or retrieving the raw data from the hard drive. He further testified that if the "nanny cam" had recorded the incident in question at a lower frame rate and it was played back at a higher frame rate, it would appear to be *451 playing in fast forward and look "jerky" in nature.
The trial court entered a written order granting Muro's motion to suppress and reaching the following legal conclusions:
If a due process violation is alleged based on destruction of evidence, it is the State's burden to prove there is no prejudice to the defendant. State v. Sobel, 363 So.2d 324, 328 (Fla.1978). Prejudice can be shown by proving the lost evidence would not [sic] have been beneficial to the defense. Snell v. State [State v. Snell], 391 So.2d 299 (Fla. 5th DCA 1980). If the State shows the evidence would have been only potentially useful for the defense, the defendant must show bad faith on the part of the State in order for there to be a due process violation. Felder v. State, 873 So.2d 1282 (Fla. 4th DCA 2004). In the case at bar, no evidence has been presented to this Court that the State acted in bad faith in the destruction of the tape. Therefore, the defense must show the evidence would be more than potentially useful.
The defense argues, and this Court agrees, there are a plethora of reasons the original recording would have been more than potentially useful to the defense. First, without it, the defense is not able to present events found in the other 78 hours of recorded time Defendant spent caring for the child which did not constitute abusive behavior. Logically, the defense would not subject the jury to 78 hours of viewing non-abusive behavior, though there would be nothing precluding such a showing. The more likely scenario is the defense would be able to view the remaining 78 hours on its own time and find particular scenes that would counteract the view that Defendant was abusive with the child. The defense could then show these scenes to the jury. Or, the defense could put a witness on the stand to testify that he or she watched the entire 80 hours and saw no abusive behavior.
Even more helpful to the defense, however, would be possible scenes between the child and the parents similar to the alleged abusive incidents perpetrated by Defendant. As the experts testified, the frames per second of the video could have an affect [sic] on how the movements of the people in the video appear. If there were only 7.5 frames per second, the movements the parents made in other parts of the video could appear to be abusive. If this jumpiness ensues even when the parents are caring for the child, the jury would be much more likely to find a reasonable doubt that Defendant's care constituted child abuse. The destruction of these recordings would be even more disturbing if the child had been injured because it would prevent the defense from showing that it could have been the parents, rather than Defendant, who caused the injuries.
Finally, the defense complains the destruction of the original recording prevents its experts from determining the exact frames per second. This is important, as explained above, to give an explanation for the jumpiness and jerkiness of the movement. Without the original recording, there is no way to know if the incidents that will be shown to the jury were filmed at 30 frames per second or 7.5 frames per second.
This Court also considers the fact that this two hour, possibly misleading, tape is the only evidence of child abuse against Defendant. [The child] has no injuries to corroborate these alleged abuses committed upon her, and [the father] himself testified there had been no problems with Defendant before this incident. This Court has struggled with *452 the decision in this case, but in light of all the considerations discussed above, this Court finds the State has not met its burden of showing there to be no prejudice to Defendant based on the destruction of the DVR. The State is encouraged to pursue an appeal on this matter.
"The standard of review applicable to a motion to suppress evidence requires that this Court defer to the trial court's factual findings but review legal conclusions de novo." Backus v. State, 864 So.2d 1158, 1159 (Fla. 4th DCA 2003); see also Errickson v. State, 855 So.2d 700, 702 (Fla. 4th DCA 2003).
The focus of this appeal is whether the trial court applied the appropriate legal standard in considering the motion to suppress the videotape produced from the "nanny cam." Each party presents a line of cases that it believes represents the proper legal standard to be applied in the case at bar. The trial court and Muro view this case as one dealing with potentially exculpatory evidence that was collected but then not preserved. The State views this case as one dealing with potentially exculpatory evidence that was not even collected by law enforcement. However, the distinction between collecting and not preserving and not even collecting potentially exculpatory evidence is one without a difference. See State v. Powers, 555 So.2d 888, 890 (Fla. 2d DCA 1990)(citing State v. Hills, 467 So.2d 845 (Fla. 4th DCA 1985))("We agree that there is no material difference between the destruction of evidence by the state's affirmative act and its destruction by the state's failure to act where it has a ready means of preserving the evidence with a minimum of inconvenience.").
The legal standard emerging out of the cases cited by the trial court and Muro is as follows. Overall, "[t]he determination of any discovery sanction to be imposed in cases where the state loses evidence depends upon the deliberateness of the act and the degree of prejudice to the defendant." State v. Snell, 391 So.2d 299, 300 (Fla. 5th DCA 1980). In State v. Sobel, 363 So.2d 324 (Fla.1978), in which law enforcement recorded a drug transaction but did not preserve the tape due to its inaudibility, the Florida Supreme Court considered standards of materiality and prejudice and held that "a defendant is not denied due process where the contents of a lost or destroyed tape recording would not have been beneficial to the accused, thus demonstrating a lack of prejudice" and that it was the State's burden to demonstrate that there was no prejudice to the defendant. Id. at 328. The State can so demonstrate that the defendant was not prejudiced by showing that "the lost evidence would not have been beneficial to the accused." Snell, 391 So.2d at 301 (a case in which law enforcement collected a firearm but inadvertently destroyed the firearm). Furthermore, "[i]n order for there to be a denial of due process, where there is no bad faith, the lost evidence must be more than merely potentially useful to the defense." Felder v. State, 873 So.2d 1282, 1283 (Fla. 4th DCA 2004)(a case in which law enforcement both collected a bicycle that was later lost and failed to collect tools and tool boxes located at the scene). Additionally, as Muro points out in her answer brief, prejudice and a denial of due process are more likely to occur where the value of the lost evidence is best assessed through scientific analysis or expert testimony. See Lancaster v. State, 457 So.2d 506, 507 (Fla. 4th DCA 1984); Stipp v. State, 371 So.2d 712 (Fla. 4th DCA 1979).
The State's line of cases fits together to result in the following legal standard. In Melendez v. State, 498 So.2d 1258 (Fla. *453 1986), a case involving potentially exculpatory evidence not collected by law enforcement, the Florida Supreme Court wrote:
This claim, relating to the opportunity to present a defense, involves "what might loosely be called the area of constitutionally guaranteed access to evidence." United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). "Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system." California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984). The concern is that the accused have access to exculpatory evidence, not all possible pieces of evidence that the police have rejected as worthless. The duty on the state is "limited to evidence that might be expected to play a significant role in the suspect's defense." Id. at 488, 104 S.Ct. at 2534 (footnote omitted). The evidence must "possess an exculpatory value that was apparent before the evidence was destroyed." Id. at 489, 104 S.Ct. at 2534. There is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." Moore v. Illinois, 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972).
Id. at 1260. In Trombetta, the United States Supreme Court wrote the following concerning the "responsibility of guaranteeing criminal defendants access to exculpatory evidence beyond the government's possession":
We have, however, never squarely addressed the government's duty to take affirmative steps to preserve evidence on behalf of criminal defendants. The absence of doctrinal development in this area reflects, in part, the difficulty of developing rules to deal with evidence destroyed through prosecutorial neglect or oversight. Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed. Cf. United States v. Valenzuela-Bernal, supra, at 870, 102 S.Ct., at 3448. Moreover, fashioning remedies for the illegal destruction of evidence can pose troubling choices. In nondisclosure cases, a court can grant the defendant a new trial at which the previously suppressed evidence may be introduced. But when evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing  as the California Court of Appeal did in this case  the State's most probative evidence.
* * * * * *
Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, see United States v. Agurs, 427 U.S. [97], at 109-110, 96 S.Ct. [2392], at 2400, [49 L.Ed.2d 342] evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.
467 U.S. at 486-487, 488-489, 104 S.Ct. 2528. Finally, in Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), a case involving evidence that was collected but not preserved, the United States Supreme Court wrote the following:

*454 The Due Process Clause of the Fourteenth Amendment, as interpreted in Brady, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in Trombetta, supra, 467 U.S., at 486, 104 S.Ct., at 2532, that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause, see Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941), as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.
Id. at 57-58, 109 S.Ct. 333.
Based on their views of the applicable legal standard, the parties make the following arguments. The State contends that no evidence was presented that suggested that the State acted in bad faith by not collecting or preserving evidence from the "nanny cam," and Muro does not so argue. Furthermore, the State maintains that Muro cannot demonstrate that the unknown evidence would have been beneficial to her defense or constitutionally material because any evidence of her gentleness was not relevant and does not overcome evidence of her criminality. Finally, a simple experiment could be conducted to determine the applicable frame rates and possibility of jumpiness, and Muro is free to cross-examine all involved on the accuracy of the videotape extracted from the "nanny cam." Overall, the State maintains that the concerns raised by Muro are matters of weight and not admissibility of evidence.
Muro responds that the test of constitutional materiality is met in the case at bar because the videotape is the only evidence of abuse, the remaining seventy-eight hours of recording should have been collected as it was immediately available to the State, the original recording was necessary to demonstrate Muro's gentleness and rebut that the shaking of the child was a volitional act where the impression of such may have been caused by the jumpiness of the recording due to the frame rates, the original recording would have revealed whether the child did indeed cry every time she was near Muro, and no experiment can replicate the precise conditions in which the "nanny cam" recording was made. Overall, the "lost" portions of the "nanny cam" recording were more than potentially useful to Muro so that *455 Muro was not required to demonstrate bad faith on the part of the State.
Turning first to a determination of the applicable legal standard in this case, our analysis of the parties' proposed legal standards reveals that they are generally the same standard. Both suggested standards fit under the umbrella standard in cases of this type which compares the deliberateness of the act with the degree of prejudice resulting from the act. The standard employed by Muro and the trial court stands for the proposition that a due process violation occurs where the potentially exculpatory evidence would be beneficial to the defense and requires such evidence to be more than potentially useful to the defense, where, as here, no allegations of bad faith have been made. The State's proposed standard stands for the proposition that law enforcement is not required to preserve and present all materials that it interacts with during an investigation, but only those expected to play a significant role in the defense, meaning those of constitutional materiality, defined as those having exculpatory value apparent prior to destruction and lacking in available comparable evidence. It should be noted that the focus on materiality in this standard mirrors the focus on materiality in cases such as Sobel upon which Muro and the trial court rely. Furthermore, the next phase of the State's legal standard requires bad faith where evidence could have been subjected to tests and was only potentially useful, which mirrors the requirement that evidence be more than potentially useful where bad faith is lacking as incorporated in the trial court and Muro's standard through Felder. Therefore, the proposed standards are largely one in the same. As such, the legal standard that we employ asks the question of whether, in the absence of bad faith, the unpreserved or improperly preserved portions of the "nanny cam" footage constituted exculpatory evidence that was more than potentially useful to Muro and constitutionally material.
Based on the circumstances of the present case and the applicable law as we interpret it, we conclude that the trial court erred by granting Muro's motion to suppress. Muro failed to establish that the remaining seventy-eight hours of recording or the original recording if preserved on the "nanny cam" hard drive was exculpatory evidence more than potentially useful to the defense.
The first ground for suppression found by the trial court was that the full, original recording may have shown many instances of Muro playing gently with the child. However, this is irrelevant in relationship to the reality of one instance in which Muro shook the child. In that one instance, Muro either committed child abuse or not under the law and in the eyes of a jury, regardless of how caring she may have been in the countless other instances that comprise eighty-hours of interaction between nanny and child. Even if scenes demonstrating Muro's gentle and loving nature toward the child were relevant to the charges at hand, unrebutted testimony indicates that the preserved videotape includes some scenes in which Muro acted in a playful, loving, and caring manner toward the child. As such, any similar scenes in the remaining seventy-eight hours of footage would be merely cumulative. Thus, the seventy-eight hours of recording would not constitute exculpatory evidence.
Turning to the second ground for suppression by the trial court, the full, original recording may have shown the father and mother engaging in questionable conduct toward the child, but this too is irrelevant to whether Muro committed child abuse in the instance in which she shook the child. *456 Clearly, the seventy-eight hours of recording would not constitute exculpatory evidence.
Considering the third ground for suppression by the trial court, the full, original recording may have revealed the frame rate of the recording and possibly established that the footage could have been "jerky" due to being played back at a lower frame rate than that at which it was recorded. At the time the videotape was made by the law enforcement technician, it cannot be said that law enforcement was aware that any part of the seventy-eight hours of recording not captured on the videotape had apparent exculpatory value, as required to satisfy the standard of constitutional materiality, or that law enforcement realized that there was technological value in preserving the original "nanny cam" recording on the hard drive. Regardless of the speculative value of the original recording, defense counsel will still have the opportunity at trial to present expert testimony, as counsel did at the suppression hearing, to call into question the accuracy of the videotape. The jury will be free to consider all of the possible technological explanations for the shaking scene in its deliberations on whether Muro committed child abuse. Thus, the seventy-eight hours of recording would not constitute exculpatory evidence that would be more than potentially useful to the defense and constitutionally material.
Whatever is contained in the full, original recording cannot be expected to play a significant role in Muro's defense for the reasons stated above. Because no due process violation occurred in this case where the original recording was not more than potentially useful to Muro or constitutionally material, we conclude that the trial court erred by granting Muro's motion to suppress.
We note that we did not take into account the actual videotapes produced by the law enforcement technician in reaching this conclusion. The State's motion to supplement the record with those videotapes was improvidently granted by this Court where, with the exception of one minute of footage aired at the bond hearing, the trial court had never viewed the videotapes and the videotapes had not been proffered.
We reverse and remand for further proceedings consistent with this opinion.
Reversed.
GUNTHER, WARNER and HAZOURI, JJ., concur.