486 So.2d 578 (1986)
William Harold KELLEY, Appellant,
v.
STATE of Florida, Appellee.
No. 65134.
Supreme Court of Florida.
April 10, 1986.
*579 Barry Haight, Milton, Mass., and Donald L. Ferguson, Coconut Grove, for appellant.
Jim Smith, Atty. Gen., and Karla J. Staker and Robert J. Krauss, Asst. Attys. Gen., Tampa, for appellee.
ADKINS, Justice.
William Kelley appeals his conviction for the first-degree murder of Charles V. Maxcy and the death sentence imposed. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
Appellant's conviction represented the resolution of a highly unusual case, raising some unusual issues. Appellant was indicted in December of 1981 for the Maxcy murder, committed in October of 1966. An explanation of this delay in prosecution requires an examination of the figures involved and the evidence adduced at appellant's trial.
John Sweet, involved in an illicit love affair with Irene, the victim's wife, planned the murder so that he and she could live together on Maxcy's inheritance. Towards this end, Sweet contacted a Walter Bennett in Massachusetts and made the necessary arrangements. A price was set, and in early October of 1966 appellant Kelley and one Von Etter carried out the sinister task.
Because prosecutors found the evidence insufficient to proceed against appellant and Von Etter, and because Irene Maxcy received immunity in return for her testimony in the case, only Sweet was originally tried. His first trial resulted in a mistrial, and the conviction resulting from his second trial was reversed on appeal. Sweet v. State, 235 So.2d 40 (Fla. 2d DCA), cert. denied, 239 So.2d 267 (Fla. 1970).
At that point, the state felt unable to proceed against Sweet due to the lapse of time and the loss of certain witnesses' testimony. Thus, the case lay dormant for over ten years. This standstill was broken only after Sweet, in 1981, became involved in a criminal situation he found threatening and approached law enforcement authorities in *580 order to seek some protection by receiving immunity in return for his testimony as to a wide variety of crimes.
It was this testimony upon which appellant's indictment and prosecution in this case were centrally based. Sweet testified as to the details of the planning and execution of the murder, as well as to a purported conversation with appellant several years after the murder in which appellant allegedly said "Boy, [Maxcy] was a powerful guy. I stabbed him three or four times and he kept coming after us, so I had to shoot him in the head." The other central testimonial evidence presented in appellant's trial below was that of one Abe Namia, a private detective originally hired after the murder by Sweet's defense counsel. Namia testified as to some purported statements of Sweet's made in 1967 incriminating appellant. The statements were admitted to rebut an inference of recent fabrication established by the rigorous cross-examination of Sweet as to his extensive immunity and possible motives to fabricate.
Appellant's first trial ended in a mistrial, the jury unable to agree on a verdict. His second trial began in March of 1984. In the verdict presently appealed, the jury found Kelley guilty of first-degree murder and recommended the death penalty. In April 1984, the trial judge filed his written findings of fact in support of the death penalty. He found three statutory aggravating circumstances: prior conviction of a violent felony, section 921.141(5)(b), Florida Statutes (1983); homicide commited for pecuniary gain, section 921.141(5)(f); and homicide committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification, section 921.141(5)(i). As a nonstatutory mitigating circumstance he found that appellant was the only participant in the murder to receive punishment.
Appellant raises a number of attacks on the trial of his case and the sentence imposed, alleging a number of prejudicial errors spanning from the time period well before his indictment to the case's conclusion. These contentions will be explored in the order presented.
Appellant first argues that the state's destruction of the real evidence in the case over five years before his indictment deprived him of due process of law and frustrated the preparation of his defense. In addressing this contention, the unusual procedural history resulting in this problem must be considered.
After the reversal of Sweet's second conviction on appeal, he successfully moved for the dismissal of his indictment. At that point, with no active suspects capable of prosecution, the case file, including the evidence involved, was transmitted to the clerk of the court for maintenance. The evidence there remained until April of 1976, nine and a half years after the murder. At that point the state, at the clerk's request, moved for an order requesting the court's permission to dispose of the evidence. The state's motion, indicating that "this cause has been disposed of," was granted and the evidence destroyed. The case subsequently lay dormant until Sweet's testimony against appellant Kelley revitalized the prosecution in 1981.
The destroyed evidence which appellant claims may have had particular exculpatory value was real evidence, principally taken from the scene of the crime  a bullet, a bloody bedsheet purportedly used to subdue the victim during repeated stabbings, and a shred of the victim's shirt. Also destroyed were two handwritten statements by Sweet, which appellant urges would have been useful in impeachment. Copies of the documentary evidence in the case, by far the bulk of the evidence presented at the earlier Sweet trials, were preserved and used against appellant in the trial below.
Appellant argues that the state's intentional destruction of the evidence of Maxcy's killing over five years before his indictment for a murder committed in 1966 so violated his due process rights that his indictment should have been dismissed. While recognizing that serious constitutional rights are involved in this question, and *581 that the trial of a capital case in the absence of physical evidence raises grave concerns as to fairness, we cannot agree that in this case appellant's due process rights have been violated.
In resolving the serious problems involved when evidence once in the possession of the state is either lost or suppressed, Florida's courts have built their analyses upon the United States Supreme Court's decisions of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Brady laid down the proposition that "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196.
The Agurs Court refined the Brady holding by exploring the concept of constitutional "materiality." The bottom line concern in a suppressed evidence case, the Court made clear, is the justice of the finding of guilt. If, upon consideration of the record as a whole, the omitted evidence creates a reasonable doubt not otherwise existing, the evidence is material and constitutional error has been committed. Due process rights are not violated in every case involving the suppression of evidence. "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish `materiality' in the constitutional sense." 427 U.S. at 109-10, 96 S.Ct. at 2400.
In State v. Sobel, 363 So.2d 324 (Fla. 1978), this Court utilized that language from Agurs in formulating an analysis applicable to the issue of appropriate sanctions when the state has destroyed evidence. Recognizing that "dismissal of charges against a defendant ... was an extreme sanction to be utilized with the greatest caution and deliberation," Sobel, 363 So.2d at 327, this Court approved an analysis balancing any negligent or culpable conduct of the prosecutor with any prejudice resulting to the defendant from the destruction of the evidence. Fairness dictated that the burden be placed on the state to prove lack of prejudice to the defendant, if it so contended.
In Salvatore v. State, 366 So.2d 745 (Fla. 1978), cert. denied, 444 U.S. 885, 100 S.Ct. 177, 62 L.Ed.2d 115 (1979), we reiterated this balancing standard, implicitly recognizing that each of the factors considered reflected different aspects of the same fundamental concern  that the defendant received a fair trial. The standard of prejudice which must be met by the defendant, we held, varies inversely with the degree to which the conduct of the trial below has violated fundamental notions of fairness. In Salvatore, finding no negligence on the part of the prosecution, we noted that "[i]t should not be presumed that error injuriously affects the substantial rights of the defendant," 366 So.2d at 751, and found that Salvatore's rights had not been violated by the loss of evidence in the case.
Appellant argues that application of the variable standard analysis established in Sobel and Salvatore to the facts of this case mandates a different result. Because the state-ordered destruction of the evidence was at best inexcusable negligence, it is argued, the conduct of the state weighs heavily towards reversal of the decision below. Citing the lack of a statute of limitations for first-degree murder, and appellant's status as a suspect since the commission of the murder in 1966, appellant urges that the state's destruction of the evidence constituted a breach of its extraordinary duty under these facts.
While we find the destruction of the evidence in this case unfortunate, we cannot read the facts as even hinting at intentional behavior by the state affecting appellant's substantial rights. While extremely hesitant to condone the state's behavior here, we find no negligence in its actions. Obviously, the state had insufficient evidence to proceed against appellant until Sweet offered his testimony in 1981. The destruction of the evidence took place nearly nine *582 and a half years after the state's fruitless efforts to convict Sweet, and five years before appellant's indictment.
In a sense, this is a case of first impression, in which the principles set forth in Brady, Agurs, Sobel and Salvatore are applicable only by analogy. In none of those cases was the lost or destroyed evidence completely unlinked to any active, or even foreseeable, prosecution. On the unusual facts of this case, therefore, the state's behavior may be excused. We wish to emphasize, however, that if even the slightest hint of prosecutorial misconduct was present in the case the result might well be different.
In applying the second prong of the analysis, we find that the state has met its burden of establishing lack of prejudice to the appellant's case. Phrased alternatively, we find that appellant has failed to establish a sufficient degree of prejudice to justify a reversal of his conviction. Demps v. State, 395 So.2d 501, 504 (Fla.), cert. denied, 454 U.S. 933, 102 S.Ct. 430, 706 L.Ed.2d 239 (1981).
In resolution of this necessarily speculative analysis, appellate courts have tended to defer to the findings of the trial court on the matter. Sobel, 363 So.2d at 328; Smith v. State, 400 So.2d 956 (Fla. 1981); Krantz v. State, 405 So.2d 211, 212 (Fla. 3d DCA 1981); Budman v. State, 362 So.2d 1022 (Fla. 3d DCA 1978). The trial court below specifically found that the destruction of the particular evidence here in question did not prejudice appellant's case, or create an otherwise non-existent reasonable doubt. In light of the centrality of testimony rather than real evidence in the case, we cannot disagree. We therefore find the denial of appellant's motion to dismiss the indictment proper.
In his second point on appeal, appellant argues that the trial court erred in permitting a witness to testify as to an alleged conversation he had with John Sweet in 1967. The witness, Abe Namia, was a private investigator hired by Sweet's trial counsel after the murder in 1966. During the conversation, Sweet allegedly made some statements which now incriminate appellant. Namia's testimony was admitted below as testimony of prior consistent statements by Sweet, rebutting an inference of recent fabrication or improper motive established in Sweet's cross-examination.
We reject appellant's contention that Namia's testimony was hearsay and improperly admitted. Defense counsel clearly established an inference of improper motive to fabricate through its extensive cross-examination of Sweet concerning the laundry list of crimes for which he had been given immunity in return for his testimony against Kelley. Appellant does not deny that the jury was left with an impression of Sweet's improper motive to fabricate, Van Gallon v. State, 50 So.2d 882 (Fla. 1951), but argues that Sweet's statements as reported by Namia were not sufficiently consistent with Sweet's testimony at trial to be properly admissible under section 90.801(2)(b), Florida Statutes (1983).
While keeping in mind that "a failure to properly adhere to the requirement of consistency tends to border on a disregard of the dangers sought to be restrained by the hearsay rule," Sosa v. State, 215 So.2d 736 (Fla. 1968), we find that the two statements concerning the murder varied in only legally insignificant aspects. More troublesome than these minor inconsistencies was the fact that Namia's recollection of Sweet's prior testimony contained certain facts beyond those in Sweet's testimony in chief, which Namia's testimony was admitted to corroborate.
Sweet, according to Namia, had informed Namia that prior to the murder certain unidentified assassins had twice travelled to Florida to kill Maxcy. Although Sweet's testimony in chief did not refer to these shadowy figures, we find that no reversible error was committed in that the additional facts involved were neither highly incriminating nor critical to the establishment of an ultimate fact in dispute. Sosa, 215 So.2d at 745.
*583 In short, appellant was not prejudiced by the admission of the testimony. We have before held, too, that questions concerning the admissibility of extrajudicial statements for the purpose of rehabilitating witnesses impeached by the inference of a recent motive to fabricate are largely addressed to the sound discretion of the trial court, and are not to be reversed in the absence of a prejudicial abuse of discretion. Sosa, 215 So.2d at 744. See also United States v. DeVore, 423 F.2d 1069, 1073 (4th Cir.1970), cert. denied, 402 U.S. 950, 91 S.Ct. 1604, 29 L.Ed.2d 119 (1971). We find no such abuse of discretion below, and so reject appellant's argument.
Next, appellant argues that the trial court erred in failing to answer a question addressed to it by the jury during its deliberations. After several hours of deliberation, the jury announced that it had reached an impasse. Upon receiving an Allen charge, Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), the jury resumed its deliberations. The interaction in question occurred when the jury subsequently inquired of the court whether "John J. Sweet received immunity in Florida for first degree murder and perjury before he gave information on the Maxcy trial, and if he had anything to gain by his testimony."
The trial court, while aware that Sweet's testimony on cross-examination established the existence of such immunity, declined to explicitly answer the jury's question concerning the crucial issue since formulating an answer would have required him to both interpret Sweet's testimony and make a judgment as to his motivation.
Rather, the trial court offered to the jury to have Sweet's testimony read back in portions designated by the jury. We can see no abuse of discretion in such action. The court's insistence upon the jury's rather than its own choice of the passages to be re-read was proper, in light of the latter's legitimate hesitation to comment upon the evidence. The jury question here involved matters of fact, and this Court has held that a trial judge need answer only questions of law raised by jurors. State v. Ratliff, 329 So.2d 285 (Fla. 1976).
In rejecting appellant's contention that the court below acted improperly in this respect, we finally note that Florida law has given the trial court a wide latitude in deciding whether or not to have testimony re-read to jurors upon request. Fla.R.Cr.P. 3.410; DeCastro v. State, 360 So.2d 474 (Fla. 3d DCA 1978), cert. denied, 368 So.2d 1365 (Fla. 1979); Simmons v. State, 334 So.2d 265 (Fla. 3d DCA 1976).
In his fourth point on appeal, appellant contends that the trial court erred in allowing the jurors to take notes during the trial and failing to adequately instruct the jury as to the proper role of note-taking. Whether or not a jury is to be allowed to take notes and use them in the deliberation process is a question within the sound discretion of the trial court. United States v. Rhodes, 631 F.2d 43 (5th Cir.1980); United States v. Riebold, 557 F.2d 697 (10th Cir.), cert. denied, 434 U.S. 860, 98 S.Ct. 186, 54 L.Ed.2d 133 (1977).
The jurors were informed by the court that note-taking was optional, and instructed that a juror's note-taking in no way gave him or her authority over the others on the panel. We reject appellant's assertion that the jury was inadequately instructed, noting that no additional or different instructions on the matter were proposed by the defense below.
Next, appellant argues that the trial court erred in admitting certain of his post-arrest statements to FBI agents obtained in violation of his Miranda rights. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant, allegedly in a slightly inebriated condition, was given and examined a Miranda warning form for 15-20 seconds before he returned it saying "I know my rights." Later in the book-in procedure, appellant learned that he was wanted in Highlands County, Florida, for murder. After an agent commented to appellant "I'm certainly sure that Highlands County is going to place a detainer on you once they know you *584 have been arrested in Florida," appellant made some statements about Maxcy's murder.
We need not reach in this case the validity of the Miranda warnings as given, and the possible effect of appellant's intoxication, in light of our finding that the agent's statement was not an interrogation within Miranda's purview. The statement, in other words, was not a deliberate attempt to elicit an incriminating response, as prohibited by Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The incriminating statements here in question were therefore volunteered, and neither the letter nor spirit of Miranda has been violated. The statements were therefore properly admitted into evidence.
Appellant next mounts an attack on certain instructions given to the jury in an effort to break a deadlock after it had deliberated for several hours and announced that it had reached an impasse. The judge gave Florida Standard Jury Instruction 3.06, the authorized jury deadlock instruction, and then proceeded to add some comments of his own. These comments, appellant argues, impermissibly misled and so coerced the jury into returning a verdict that appellant was deprived of his right to a fair trial.
As we have before recognized, the standard jury instructions should be utilized whenever appropriate, State v. Bryan, 290 So.2d 482 (Fla. 1974); Rigot v. Bucci, 245 So.2d 51 (Fla. 1971), for a trial judge walks a fine line indeed upon deciding to depart. Instructions given to a jury at the extremely sensitive point it has reached a deadlock must be carefully scrutinized, Kozakoff v. State, 323 So.2d 28 (Fla. 4th DCA 1975), cert. denied, 336 So.2d 1184 (Fla. 1976), and the risk is too great that an imprudent instruction may lay to waste the conscientious conduct of an otherwise entirely fair trial.
While the standard instructions are therefore to be preferred, the trial court's failure to give them does not determine the issue. A court's straying from the standard instructions, we have held, does not require automatic reversal. State v. Bryan, 290 So.2d 482 (Fla. 1974). The analysis is not so simple. We must here join the courts which have scrutinized extemporaneous deadlock instructions with an eye towards ensuring that no false duty to decide was suggested, Nelson v. State, 438 So.2d 1060 (Fla. 4th DCA 1983); Lincoln v. State, 364 So.2d 117 (Fla. 1st DCA 1978), that the verdict returned was not coerced, Jenkins v. United States, 380 U.S. 445, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965), and that the instructions were "balanced," encouraging neither acquittal nor conviction. State v. Bryan, 290 So.2d 482 (Fla. 1974); Gardner v. State, 405 So.2d 470 (Fla. 3d DCA 1981).
At this point it may be helpful to consider the actual instructions which appellant here attacks:
I would ask that you give it your full consideration. It is an important case.
If you fail to reach a verdict, there is no reason to believe the case can be tried again any better or more exhaustively than it has been.
There is no reason to believe there is any more evidence or clearer evidence could be produced on either side. And there is no reason to believe the case could be submitted to twelve more intelligent and impartial people than you are.
In the future a jury would be selected in the same manner that you were.
Therefore, I would ask that you retire at this time and consider whether you wish to consider the matter further.
It has taken us a week to get this far, and I would ask that you retire and consider the case further.
Appellant contends that these instructions so strayed from permissible bounds that the jury was coerced into returning its verdict of guilt, and that the verdict must therefore fall. While reluctant to engage in the speculative analysis of the effect these instructions may have had on the uncertain jury deciding appellant's guilt, we must, and find that caselaw and logic support the appealed conviction.
*585 A fine line must be drawn in such an analysis, but we find that substantially similar instructions have been upheld, United States v. Dixon, 593 F.2d 626 (5th Cir.), cert. denied, 444 U.S. 861, 100 S.Ct. 126, 62 L.Ed.2d 82 (1979), and that instructions found prejudicial differ in some crucial respects from the instructions given below. Appellant contends, for example, that the result in Nelson v. State, 438 So.2d 1060 (Fla. 4th DCA 1983), should obtain in the instant case. For purposes of comparison, it will be useful to examine the instructions given in that case:
I don't think that anybody here would be served by you all not arriving at a verdict. It would be wasting your time for whatever period of time which I guess is ... seven days now. Nobody can repeat this testimony and exhibits placed before you. If you all cannot arrive at a verdict, then something is wrong.... You just don't understand what happens if we had to retry this case. It is not just reproducing the witnesses ... but it is going through this whole reppertoire [sic] again for you or for someone else when it is really not necessary. You have heard all the law. That is all the evidence there is. That is it as far as what was presented here before you. We look to you for the resolution of this case. It's that pure and simple... .
I can't see that it would be impossible when we have just such a fine jury here.
438 So.2d at 1061.
The Fourth District found these instructions coercive in effect. A close examination of the instructions makes clear the prejudicial components which rendered the statement as a whole sufficiently coercive to justify the reversal of a first-degree murder conviction.
First, the instructions subverted the proper role of a jury in a capital trial by implying a false duty to reach a verdict in the case. Lincoln v. State, 364 So.2d 117 (Fla. 1st DCA 1978). Second, the jury was left with the impression that failure to return a verdict would constitute waste, and would put the court to a great deal of trouble upon retrial. United States v. Betancourt, 427 F.2d 851 (5th Cir.1970).
Because the instructions in Nelson "made it appear that unless a verdict was reached ... the court's confidence in the jury's common sense would somehow have been betrayed," 438 So.2d at 1063, the Fourth District found the risk unacceptably high that even a single juror may have been influenced to abandon his conscientious belief as to the correctness of his position.
The instructions given in the instant case presented no similar threat to the integrity of the jury system. Rather than demanding a verdict, the judge below demonstrated an attitude represented by his statement, "I would ask that you retire at this time and consider whether you wish to consider the matter further." We also note that the jury continued to deliberate for a considerable period of time after receiving the instruction, returning to ask the court for an unrelated instruction. In sum, while disapproving of such departure from Florida's Standard Jury Instructions, we can find no prejudice resulting from the instructions as given.
In his seventh point on appeal, appellant argues that he was denied his sixth amendment right to the effective assistance of counsel. Generally, such claims are not reviewable on direct appeal but are more properly raised in a motion for post-conviction relief. Perri v. State, 441 So.2d 606 (Fla. 1983); State v. Barber, 301 So.2d 7 (Fla. 1974). Unlike those claims raised under the banner of ineffective assistance which we determined should have been raised on direct appeal in Adams v. State, 456 So.2d 888 (Fla. 1984), the claims here raised by appellant cannot be sufficiently determined by the record as it stands. The issue is therefore not properly raised here.
Finally, appellant raises a number of arguments attacking the application of the death penalty statute to his case and the statute's constitutionality. Having carefully reviewed each of these contentions, they are found to be without merit. *586 Appellant's conviction and death sentence are therefore affirmed.
It is so ordered.
BOYD, C.J., and EHRLICH and SHAW, JJ., concur.
OVERTON, J., concurs specially with an opinion.
OVERTON, Justice, concurring specially.
Because this involves the "triggerman" in a contract killing, the death penalty is appropriate. I am concerned, however, that our system of justice has allowed Sweet, who instigated, planned, and directed this murder, to receive total immunity from prosecution for this murder.