ALTENBERND, Judge.
John R. Bennett seeks certiorari review of a circuit court’s appellate decision reinstating a DUI charge against him in county court. The county court had dismissed the DUI charge because either a deputy sheriffs video camera failed to record the roadside field sobriety test or the digital recording system in the sheriffs office failed to preserve the recording. The circuit court reversed this order, concluding that the case was controlled by the holding in State v. Betts, 659 So.2d 1137 (Fla. 5th DCA 1995), and that the county court had mistakenly treated dicta in State v. Powers, 555 So.2d 888 (Fla. 2d DCA 1990), as a holding from this court. As further explained in this opinion, in light of the decisions in Samborn v. State, 666 So.2d 937, 938 (Fla. 5th DCA 1995), and State v. Davis, 14 So.3d 1130 (Fla. 4th DCA 2009), we conclude that the circuit court did not depart from the essential requirements of the law in reaching this decision and in remanding the case to the county court where this complex issue can be explored in greater detail.
The issue in this case — at least at the county court level — is what, if any, sanction should be imposed upon the State when it attempts to create physical evidence for use in a criminal proceeding, under circumstances where it has no legal duty to create that evidence, and in the *784 process of preparing that physical evidence, it inadvertently destroys the preliminary work or data and is unable to produce the desired evidence for use at trial
At the conclusion of this opinion, we provide a lengthy discussion — in dicta — of the decisions by the Florida supreme court in State v. Sobel, 363 So.2d 324 (Fla.1978), and Kelley v. State, 486 So.2d 578 (Fla.1986) (Kelley I), and of the decisions of the U.S. Supreme Court in California v. Trombetta, 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), and Arizona v. Young-blood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988), that form the starting point for any analysis of the above-referenced issue. It appears to us that the analysis of the issue may be somewhat different under Sobel than under Young-blood. An examination of cases from around this country also suggests that other courts have not settled on a single analytical structure for the resolution of this issue.
At least in this case, which involves the loss of an opportunity to present a video recording of a field sobriety test, there can be little doubt that a recording would have been “relevant” to establish a “material” fact as those terms are defined in section 90.401, Florida Statutes (2007), of the evidence code. The decisions related to this issue, however, discuss a concept of “constitutional materiality” that seems more complex. The analysis in Youngblood creates different outcomes depending on whether the lost evidence is “materially exculpatory” or “potentially useful.” 488 U.S. at 57-58,109 S.Ct. 333.
A serious difficulty in the analysis of this problem arises because, although it is obvious that a recording of the field sobriety test would be very relevant to a material fact at a trial on the charge of DUI, it is usually very difficult to determine whether this evidence would have been inculpatory, exculpatory, or inconclusive. It does not appear that the U.S. Supreme Court intends to require dismissal of criminal charges merely because evidence that would be relevant under the rules of evidence has been lost. On the other hand, it is not entirely clear in Florida who has the burden of proof and persuasion within this due process analysis when it comes to deciding whether the missing evidence would be “exculpatory” or “potentially useful.”
Admitting that our suggestion is only dicta, at least in the case of potential evidence that is accidently destroyed when the State has no legal obligation to create the evidence, we are inclined to believe that before lost evidence is declared to be “material exculpatory evidence,” the defendant should have a threshold burden to persuade the trial court, perhaps by the preponderance of the evidence, that (1) the lost opportunity to present relevant evidence involved evidence that would have created a reasonable probability that the outcome of the proceeding would have been different, and (2) the defendant did not have an adequate alternative method to provide comparable evidence. Only after such a threshold showing would the burden shift to the State to prove that the defendant had not been prejudiced. Whether dismissal is the only adequate sanction for an inadvertent loss of material exculpatory evidence is an issue that may require case-by-case analysis for which we suggest no solution — even in dicta.
Accordingly, this case presents a challenge to the county court, but it is obvious that the circuit court did not depart from the essential requirements of the law in sending the matter back for more consideration.
*785 I. The Proceedings in the County and Circuit Courts
A deputy sheriff stopped Mr. Bennett while he was operating a motorcycle on July 3, 2007, at 10:11 p.m.[1] The stop ultimately resulted in the State’s charging Mr. Bennett with DUI. Mr. Bennett and the deputy provided substantially different versions of the stop at a hearing on a motion to dismiss the charges.
The deputy testified that a passing driver told him that Mr. Bennett was weaving in his lane. After observing Mr. Bennett driving erratically, the deputy stopped him. Mr. Bennett admitted that he had had three beers on an empty stomach. Mr. Bennett smelled of alcohol and had slurred speech. The deputy conducted a field sobriety test and filled out the standard form documenting Mr. Bennett’s poor performance on that test. The deputy arrested Mr. Bennett and transported him to the county jail, where Mr. Bennett refused to provide a breath sample.
Mr. Bennett testified that he told the deputy that he had had three beers hours earlier. He said that he did quite well on the field sobriety test, that he had not made certain statements the deputy claimed he made, and that his speech was not slurred.
There is no dispute that the deputy be- ■ lieved that he recorded the stop and the field sobriety test on a digital video camera that was mounted on the cage inside his police car. The camera had a red light that indicated when it was functioning and recording. The deputy testified that the light was on during this stop. The camera worked by recording data onto a removable storage device. The deputy would later transfer the data to a DVD using equipment in the sheriffs office. The deputy testified that this equipment, which has since been replaced, malfunctioned with some frequency. For whatever reason, no video of this stop could be transferred to a DVD, and the data on the removable storage device was apparently lost in the attempt to transfer it. No one suggests, and the county court did not find, that the deputy did anything intentionally to destroy the evidence.
In its order of dismissal, the county court found that the video camera was functioning that night and recorded the stop onto the removable storage device but that the recording was subsequently lost in the effort to transfer it. This is the most likely explanation, but it is also possible that the camera malfunctioned and recorded nothing. The circuit court recognized this possibility in its opinion. Under either factual circumstance, however, the county court’s analysis of the case was incorrect and the circuit court’s analysis was correct.
The county court correctly found that if a -video recording of the stop existed, it would be material evidence in the case. The county court then determined that Mr. Bennett had been prejudiced by the loss of this evidence because it might corroborate his version of the events. The county court concluded that the accidental loss of the data on the digital storage device was a due process violation that warranted dismissal of the case without any further examination of the evidence. The county court explained that it did not need to decide whether the deputy acted in good or bad faith because, once the evidence was lost, the State was required to prove that the loss had not been prejudicial to the defendant, and the State could *786 not prove a lack of prejudice under the competing factual claims in this case. This decision was strongly influenced by our earlier decision in Powers.
In reversing the county court, the circuit court briefly explained that the county court failed to determine whether the video recording would have been exculpatory evidence. It emphasized that the video footage had been lost due to a “technical failure” and not an intentional act. It relied on Betts, which held that the failure of a video camera to operate, without more, did not constitute a due process violation, and concluded that Mr. Bennett had not established a due process violation. 659 So.2d at 1137.
II. The Narrow Standard of Review in a Certiorari Proceeding Reviewing an Appellate Decision from a Circuit Court
In reviewing the order, we are limited to determining whether the circuit court afforded Mr. Bennett procedural due process and whether it “applied the correct law” or “departed from the essential requirements of law.” See Dep’t of Highway Safety & Motor Vehicles v. Stenmark, 941 So.2d 1247, 1249 (Fla. 2d DCA 2006). A “departure from the essential requirements of the law” necessary for the issuance of a writ of certiorari is something more than a simple legal error. See Ivey v. Allstate Ins. Co., 774 So.2d 679, 682 (Fla.2000). Instead, a district court should exercise its discretion to grant certiorari review only when “there has been a violation of a clearly established principle of law resulting in a miscarriage of justice.” Haines City Cmty. Dev. v. Heggs, 658 So.2d 523, 528 (Fla.1995).
Admittedly, the case relied upon by the circuit court, Betts, provides little analysis to support its holding. However, in a similar case, Sambom, the Fifth District denied a petition for certiorari review of a circuit court decision that reinstated a DUI charge against the petitioner in county court. 666 So.2d at 938. The petitioner challenged the local sheriffs office policy of destroying potentially exculpatory maintenance testing results on its breath-testing machines. Id. at 937-38. Although the circuit court upheld the county court’s findings, it reversed the decision, concluding that the county court had not utilized a proper legal analysis. Id. at 938. “The circuit court explained that, in determining whether the loss or destruction of potentially exculpatory evidence constitutes a due process violation, a trial court must apply the tests established in [Trombetta) and [Youngblood ].” Id. Applying these tests, the Fifth District concluded that it had no basis to grant certiorari relief. Likewise, in this case, we conclude that this court should deny certiorari relief.
Recently, the Fourth District reviewed a circuit court’s decision to dismiss a felony DUI charge because of the loss of a video recording of a field sobriety test. See Davis, 14 So.3d at 1131. In Davis, the data appears to have been lost in essentially the same manner as it was lost in this case. Id. Accordingly, the Fourth District in Davis was procedurally in a similar position to the circuit court in this case. Like the circuit court in this case, the Fourth District reversed the trial court and remanded for further proceedings. Id. The analysis in Davis, however, was distinctly different from the analysis in the circuit court opinion that we review today.
The Fourth District recognized that the due process analysis of a loss of evidence is different when the evidence is “material exculpatory evidence.” Id. at 1132. Relying heavily on a case from Oregon, the Fourth District decided that the lost evidence at issue was “material,” but nevertheless reversed the trial court because it decided that dismissal was too harsh a *787 sanction. Id. It left it to the trial court to determine what lesser sanction would be appropriate. Id. at 1134.
We are troubled by aspects of the decision in Davis. First, the decision implicitly assumed that the lost video recording would have supported the defendant and not the officer’s version of the events. Perhaps something in the record supported that conclusion.[2] It seems to this court that such a recording could be either very prejudicial to the defendant as incul-patory evidence in some cases, very helpful to the defendant as exculpatory evidence in other cases, and — perhaps most often— possibly useful to both sides.
The analysis in Davis relied on the Florida decisions in Sobel and Kelley I that are discussed later in this opinion, but made no reference to the U.S. Supreme Court’s decisions in Trombetta and Youngblood. As we discuss later, the analysis in Sobel predates Youngblood. The loss of evidence in this case seems more likely to be a loss of “possibly useful” evidence under the analysis in Youngblood, which would require a far different analysis.
Despite our concerns with the Fourth District’s analysis, it is precedent supporting the circuit court’s decision to reverse the order of dismissal. The circuit court’s decision, although holding that the defendant had not established a due process violation, did not preclude the defendant from seeking to prove such a violation on remand. The circuit court’s decision also would not preclude the county court from selecting a lesser sanction as authorized by Davis. Given that the county court was misled in its analysis by the dicta from this court, we cannot say that the circuit court departed from the essential requirements of the law in this case and note that the defendant continues to have avenues to challenge this issue in the county court.
III. This Court’s Coutribution to the County Court’s Error
In dismissing the charges against Mr. Bennett, the county court’s decision gave great weight to language found in Powers. In Powers, this court held that the failure of a sheriffs department to have a policy of videotaping field sobriety tests did not warrant the dismissal of a DUI charge where no recording had ever occurred. 555 So.2d at 891. At the beginning of the legal analysis, we considered a hypothetical case in which a recorded tape was not preserved. Id. at 889. We stated:
Based upon the record presented to us, if the appellees’ performances had been video taped and the tape had not been preserved, we would affirm the trial court’s dismissal of the charges filed against the appellees without having to consider the good or bad faith of the sheriffs department. An accused’s due process rights are violated, irrespective of the good or bad faith of the prosecution, if the prosecution suppresses material evidence favorable to the accused.
Id. at 889-90 (citation omitted). It is possible that the record in Powers warranted this assurance. Unfortunately, our unqualified assurance of a reversal-free dismissal seems to have been an overstatement. The Fourth District appropriately criticized this portion of Powers in Davis. The above-quoted language should not be regarded as a holding by this court.
IV. An Overview of Relevant Case Law
When a case comes to the district court as a certiorari proceeding and the district court declines to issue a writ and to quash the order on review, our holding is normal *788 ly quite narrow. We decide only whether the circuit court provided due process and did not depart from the essential requirements of the law. There is a natural tendency, however, for the district court to wish to discuss the underlying legal issue and sometimes to disguise that discussion as if it were the holding in the case. See Dep’t of Highway Safety & Motor Vehicles v. Nader, 4 So.3d 705, 709 (Fla. 2d DCA 2009). In this case, we have concluded that the county court on remand might benefit from our discussion, but we make no pretense that our discussion is a holding. The issue in this case is a difficult issue with constitutional dimensions and it is an issue in which the law is almost certainly evolving. The proceedings in the county court on remand may be part of that evolution.
The theory that the State has a constitutional duty to provide helpful evidence to the defendant, much less to maintain or create such evidence, is a theory of relatively recent recognition. The discussion usually begins with the holding in Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), stating that, without regard to the good faith or bad faith of the prosecutor, the prosecution’s failure to produce existing evidence when requested by the defendant violates due process when the evidence is material either to guilt or punishment. That holding was made in the context of a case in which only the penalty phase of a capital case was remanded for new trial when the prosecution failed to disclose an existing confession by a codefendant in which the code-fendant admitted that he had been the actual murderer. Id. at 84-85, 83 S.Ct. 1194. Brady did not involve lost evidence, and the due process violation did not require a dismissal of the prosecution.
Thereafter, in Florida, several decisions were issued involving evidence that had been inadvertently lost. In Farrell v. State, 317 So.2d 142 (Fla. 1st DCA 1975), law enforcement officers taped conversations during a drug transaction. They apparently did not regard such tapes as admissible evidence and were regularly reusing the tapes in other investigations. Id. at 143. Thus, the tape in Mr. Farrell’s case had been erased. Id. Treating the inadvertently erased taped similarly to the written confession that still existed in Brady, the court held that the information must be dismissed. Id. at 144. A special concurrence in Farrell pointed out that the State had stipulated that the tapes would have been beneficial to the defendant in that case. Id. It is also important to note that the tape in Farrell was destroyed after the defendant had filed his demand for discovery in the criminal case. Id. at 143-44.
In State v. Smith, 342 So.2d 1094 (Fla. 2d DCA 1977), this court considered a case in which a similar tape recording of a drug transaction was misplaced. The trial court dismissed the action based on Farrell and Brady. Id. at 1095. We reversed the dismissal, explaining that dismissal was an extreme sanction and there had been no evidence that the tape “contained material favorable to” Mr. Smith. Id. We instructed the trial court on remand to determine if the tape was indeed Brady material and, if necessary, to determine the State’s culpability before imposing a sanction under the sanction provision in Florida Rule of Criminal Procedure 3.220. Id. Our opinion does not explain who will have the burdens of proof and persuasion in the trial court.
In Wiese v. State, 357 So.2d 755 (Fla. 4th DCA 1978), the Fourth District considered a case in which the defendant and a man named Smith had allegedly been the getaway drivers for a group of armed robbers. Smith gave a sworn written state *789 ment and the State had recorded the interview at which he agreed to give the written statement. Id. at 757. The State did not provide the tape in discovery and it was later destroyed. Id. When defense counsel discovered this problem during trial, the court conducted a Richardson[3] hearing at which the State established that the written statement and the lost tape were consistent and, thus, the defendant had not been prejudiced. Id. at 757-58. The opinion placed the burden of proof on the State, but did so within the context of a Richardson hearing in what appears to have been a conceded discovery violation. Id. at 758.
With these cases as background, the Florida Supreme Court considered Sobel, in which the defendant had been convicted of the sale or delivery and possession of a controlled substance. 868 So.2d at 325. The police tape recorded the drug transaction in which the defendant sold the drugs to a confidential informant and an undercover officer posing as the Cl’s girlfriend. Id. at 326. However, when an officer tried to play back the audio recording, he “heard only noises and static[,] nothing clear from which he could make any sense.” Id. Apparently, the transmitter and receiver used to record the drug transaction did not work. The department did not save the tape; instead, the officer put it into the office’s reusable tape bin. Id. The trial court had conducted a pretrial evidentiary hearing and refused to dismiss the charges because it concluded the defendant had not been prejudiced. The Third District reversed that ruling and the State appealed. Id.
When the case reached the supreme court, it began its analysis with Brady, even though it appears that the officer had placed the poor quality recording in the reusable bin on the same day as the drug transaction. Id. The trial court had accepted the testimony of the officer that the tape was almost entirely unintelligible. Thus, it is not entirely clear that any Brady evidence ever existed to be maintained or produced by the State in Sobel. The supreme court did not consider this possibility.[4]
The court then discussed whether the lost tape would have been material. Id. at 326-27. It relied extensively on United States v. Agurs, 427 U.S. 97, 109-10, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), quoting, “[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish ‘materiality’ in the constitutional sense.” Id. Thereafter, it explained that “[t]he lost tape here had major potential importance to the question of guilt or innocence, since it might have enabled appellants to contradict the testimony of the undercover agent involved in the narcotics transaction.” Id. at 327. Given that the court recognized that the tape had been almost entirely unintelligible, despite the discussion of materiality, it is not entirely clear that the court actually ruled on whether this tape was constitutionally material. Instead, it chose the easiest path to resolve the case. It held that “a defendant is not *790 denied due process where the contents of a lost or destroyed tape recording would not have been beneficial to the accused, thus demonstrating a lack of prejudice.” Id. at 328. It seemed to place the burden on the State to show this lack of prejudice, as the Fourth District had in Wiese, without ever considering that its holding might actually have been a decision that the defendant failed to establish that the poor quality tape had been constitutionally material in the first place.
Shortly after Sobel, the court upheld the conviction and death penalty imposed upon the defendant in Salvatore v. State, 366 So.2d 745 (Fla.1978). Salvatore involved a lost tape recording of a statement that a codefendant had given to the police. Id. at 750. The court placed the burden on the defendant to establish that he had been prejudiced, explaining that the “standard of prejudice which must be met by defendant in order to obtain a new trial varies inversely with the degree to which the conduct of the trial has violated fundamental notions of fairness.” Id. at 751.
In 1984, the U.S. Supreme Court issued its decision in Trombetta, 467 U.S. 479, 104 S.Ct. 2528. In that case, the defendants had been stopped for driving while intoxicated and each had submitted a breath sample for analysis by a breath testing machine. Id. at 482, 104 S.Ct. 2528. The police arguably did not lose or destroy evidence; they simply did not have a policy of maintaining a portion of the breath sample for a future second analysis. Id. at 482-83, 104 S.Ct. 2528. Each defendant filed a motion to dismiss the charges, alleging that the officers erred in not preserving them breath samples. Id. They contended that the breath samples would have allowed them to impeach the incriminating breath test results. Id. at 483, 104 S.Ct. 2528.
In rejecting the defendants’ claim that failure to preserve their breath samples violated their due process rights, the Court acknowledged the lack of precedent addressing a State’s duty to preserve evidence. Id. at 487, 104 S.Ct. 2528. The Court wrote that:
We have, however, never squarely addressed the government’s duty to take affirmative steps to preserve evidence on behalf of criminal defendants. The absence of doctrinal development in this area reflects, in part, the difficulty of developing rules to deal with evidence destroyed through prosecutorial neglect or oversight. Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed. Moreover, fashioning remedies for the illegal destruction of evidence can pose troubling choices. In nondisclosure cases, a court can grant the defendant a new trial at which the previously suppressed evidence may be introduced. But when evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing — as the California Court of Appeal did in this case — the State’s most probative evidence.
Id. at 486-87, 104 S.Ct. 2528. The Court explained that the duty to preserve evidence is limited to “evidence that might be expected to play a significant role in the suspect’s defense,” and equated this to a standard of “constitutional materiality.” Id. at 488-89, 104 S.Ct. 2528. It defined “constitutional materiality” as evidence that possesses “an exculpatory value that was apparent before the evidence was destroyed,” and which is “of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.” Id. at 489, 104 *791 S.Ct. 2528. It concluded that the State has an affirmative duty to preserve only material exculpatory evidence and that the mere possibility that lost or destroyed evidence could have exculpated the defendant is not enough to satisfy this definition. Id. Ultimately, it held that the Due Process Clause did not require law enforcement to preserve the breath samples. Id. at 491, 104 S.Ct. 2528.
Two years later, the Florida Supreme Court issued Kelley I, 486 So.2d 578, which discussed Brady, Agurs, and Sobel, but did not make any references to Trombetta. In Kelley I, the State had destroyed evidence from an old murder investigation because it appeared that there was insufficient evidence to proceed against the defendant, William Kelley. Id. at 579. However, when a witness came forward and agreed to testify against the defendant, the State charged him with murder and went to trial without the destroyed evidence. After he was convicted and sentenced to death, he appealed, arguing that the State’s destruction of the evidence violated his due process rights and hindered his ability to defend himself. Id. Applying the balancing test announced in Sobel and Salvatore, the supreme court rejected his claim, concluding that the State was not negligent in destroying the evidence and had sufficiently established that its actions had not prejudiced the defendant. Id. at 581-82. In adjacent paragraphs, the opinion notes that “[f]airness dictated that the burden be placed on the state to prove lack of prejudice to the defendant” in Sobel, and that “[t]he standard of prejudice which must be met by the defendant” was not met in Salvatore. Id. at 581.
The destroyed evidence in Kelley I was a bullet, a bloody bedsheet, and a shred of the victim’s shirt. Id. at 580. If the supreme court had used the analysis in Trombetta, it seems likely that it could have held that the exculpatory value of this evidence was not evident at the time it was destroyed and the destroyed evidence had not been material exculpatory evidence.
Finally, after Sobel and Kelley I, the United States Supreme Court decided Youngblood, 488 U.S. 51, 109 S.Ct. 333. In Youngblood, the Arizona Court of Appeals reversed the child molestation, sexual assault, and kidnapping convictions against a defendant because the State failed to preserve semen samples from the victim’s body and clothing. 488 U.S. at 52, 109 S.Ct. 333. The victim was ten years old and did not know the perpetrator. Id. The defendant had been identified by the young victim from a photographic lineup. Id. at 53,109 S.Ct. 333. The appeals court noted that identity was an issue at trial and said that the evidence could have exonerated the defendant if preserved. Id. at 54-55, 109 S.Ct. 333. It concluded that the unpreserved evidence was material to the defendant and its loss impugned his due process rights. Id. at 54, 109 S.Ct. 333.
The U.S. Supreme Court disagreed. It noted that the unpreserved evidence had a likelihood of exonerating the defendant, but determined that its loss did not warrant reversal of the convictions. Id. at 56, 109 S.Ct. 333. It concluded the evidence was only potentially exculpatory and “[t]he possibility that the semen samples could have exculpated [the defendant] if preserved or tested [was] not enough to satisfy the standard of constitutional materiality in Trombetta.” Id. The Court wrote that “the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.” Id. at 57, 109 S.Ct. 333. It then concluded that a defendant must *792 show bad faith loss or destruction of potentially useful evidence to establish a denial of due process. Id. at 58, 109 S.Ct. 333.
Interestingly, in 1990, William Kelley’s death sentence was reviewed again by the Florida Supreme Court in a postconviction proceeding. See Kelley v. State, 569 So.2d 754 (Fla.1990) (Kelley II). This time, the supreme court was aware of Youngblood. Instead of the long analysis that it had provided in the direct appeal, the court merely noted that, in the absence of bad faith, it was not a violation of due process if the police failed to preserve potentially useful evidence. Id. at 756. This appears to confirm that the analysis in the direct appeal would have been based on Trombet-ta if the court had considered that case.
After Trombetta and Youngblood, Florida courts began analyzing lost or destroyed evidence cases to determine whether the evidence at issue was either material exculpatory evidence or potentially useful evidence that did not involve a due process violation in the absence of bad faith on the part of the State. See, e.g., State v. Larrinaga, 569 So.2d 911 (Fla. 5th DCA 1990).
Thus, by the time the Fifth District considered the petition for certiorari in Sambom, it was entirely appropriate for the circuit court to reverse the county court. The county court had used an analysis relying on Sobel and Kelley I that was no longer accurate under Trombetta and Youngblood. Sambom, 666 So.2d at 938. The circuit court properly required the reinstatement of DUI charges against the defendant in Sambom because the destroyed evidence was only potentially exculpatory and its inadvertent loss did not violate the defendant’s due process rights. Id.
Y. Differing Approaches to the Issue
We provide the preceding, admittedly didactic, discussion of the case law to support at least two significant observations. First, this is an area of the law in which it is not safe merely to find an older precedent and rely upon a sentence or two from that case to justify the outcome in a current case. Although the Florida Supreme Court has never expressly recognized that its analysis in Sobel is significantly affected by Youngblood, it is obvious that it has been so affected.
Second, there are significant issues involving the implementation of Youngblood that are not well resolved in Florida, the most significant being whether the State or the defendant has the burden to establish that the lost evidence is material exculpatory evidence or potentially useful evidence.
A review of other jurisdictions reveals that the inadvertent destruction of evidence after Youngblood is addressed in differing ways.[5] In Davis, 14 So.3d at 1132, the Fourth District relied on an Oregon case to supports its decision. See State v. Zinsli, 156 Or.App. 245, 966 P.2d 1200 (1998). Oregon clearly places the burden on the defendant to show the “fa-vorableness” of the evidence when the state has not acted in bad faith. Id. at 1204.
Here, defendant concedes that the state did not act in bad faith in failing to preserve the videotape. Thus, defendant has the burden of showing that there was a reasonable likelihood that the videotape would provide evidence that would be favorable to a material *793 element of his defense and that he can not obtain comparable evidence through other reasonable means.
Id. In Zinsli, the court explained that the police in that case admitted that the defendant had performed well on aspects of the field sobriety test. Id. Thus, the Oregon court held that the defendant had carried his burden to establish that the lost videotape was material exculpatory evidence. Id. Even in that context, the Oregon court believed that sanctions less than dismissal were appropriate and remanded for further proceedings. Id. at 1205. Given the Fourth District’s reliance on this case in Davis, we assume that Davis involved a situation where the tape admittedly contained evidence favorable to the defendant. In this case, of course, that is a hotly disputed issue.
A recent decision in Ohio involved a similar loss of a video recording of a traffic stop. See State v. Piper, 2008 WL 170666 (Ohio Ct.App. Jan. 11, 2008). Although relying on Ohio cases, the court provided an excellent analysis for determining when a state’s failure to preserve evidence violates a defendant’s right to due process of the law. Id. at *1-3. The court cited Youngblood for the proposition that there is a difference between failing to disclose “material exculpatory evidence” and failing to preserve evidence “of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.” Id. at *1. The court stated that:
[T]he Youngblood court established two tests: one that applies when the evidence is “materially exculpatory” and one that applies when the evidence is “potentially useful.” If the state fails to preserve evidence that is materially exculpatory, the defendant’s rights have been violated. However, evidence is material only if there is a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome. Stated in other words, [t]o be materially exculpatory, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. This court has consistently held that the burden of proof is on the defendant to show the exculpatory nature of the destroyed evidence.
If, on the other hand, the state fails to preserve evidence that is potentially useful, the defendant’s rights have been violated only upon a showing of bad faith. The term “bad faith” generally implies something more than bad judgment or negligence. It imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud. It also embraces actual intent to mislead or deceive another.
Id. at *2 (citations and internal quotations omitted). Based on this analysis, the court concluded that there was no bad-faith destruction of evidence and the lower court properly denied the defendant’s motion to dismiss.[6] Id. at *5.
*794 Since Trombetta and Youngblood, most Florida decisions appear to place the initial burden of proof and persuasion on the defendant to prove that the lost evidence was material exculpatory evidence. See, e.g., State v. Muro, 909 So.2d 448, 455 (Fla. 4th DCA 2005) (finding that the defendant failed to establish that the destroyed evidence was exculpatory more than potentially useful); State v. Erwin, 686 So.2d 688, 689 (Fla. 5th DCA 1996) (reversing motion to suppress because the defendant “was required to show bad faith upon the part of the state in destroying the evidence”). Nevertheless, the burden of proof established in Sobel has never been withdrawn by the supreme court.
VI. Conclusion
On remand in the county court, the arguably unresolved issue of who has the burden of proof and persuasion may be important. If the semen at issue in Youngblood, which even in 1988 could have produced evidence excluding the defendant as the perpetrator, was not material exculpatory evidence to refute the young victim’s identification because the outcome of tests on that semen was unknown and, thus, its value as exculpatory evidence was unknown, it would seem that a videotape of a field sobriety test is likewise not material exculpatory evidence unless the police admit that it contained evidence that supported the defendant’s theory that he was sober.[7] Until recent years, DUI cases were often a contest of credibility between the officer and the operator, and that contest did not create a due process issue. Thus, if Mr. Bennett is ultimately determined to have the burden of proof and persuasion on the issue of whether the lost videotape was exculpatory evidence, it would seem that he may need to convince the trial judge that he is telling the truth and the police officer is not.
The petition for writ of certiorari is denied.
CASANUEVA, C.J., Concurs.
KHOUZAM, J., Concurs in result only.

. The record contains limited evidence. This description relies extensively on the arrest report.

. As discussed later, the Oregon case relied on by the Fourth District did involve a lost videotape that provided favorable evidence for the defendant.

. Richardson v. State, 246 So.2d 771 (Fla.1971).

. In 1985, the U.S. Supreme Court expanded Brady to apply to evidence in the possession of the government and not merely to evidence in the possession of the prosecutor, but not in the context of data that was inadvertently lost by law enforcement. See United States v. Bag-ley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Bagley also refined the definition of "materiality” in a nondisclosure case to require a showing of a reasonable probability that the nondisclosed evidence would have altered the result of the proceeding. Id. at 682, 105 S.Ct. 3375.

. For a discussion of the alternative approaches states have taken in adopting or rejecting Youngblood, see Norman C. Bay, Old Blood, Bad Blood, and Youngblood: Due Process, Lost Evidence, and the Limits of Bad Faith, 86 Wash. Univ. L.Rev. 241, 287-96 (2008).

. Other states treat the loss or destruction of potentially exculpatory evidence of this type similarly. See, e.g., State v. Beltz, No. 98390, -Kan.App.2d-, 184 P.3d 286, 2008 WL 2251236 (Kan.Ct.App. May 30, 2008) (finding that the trial court erred in dismissing a DUI charge against the defendant because the defendant did not show that the State destroyed the video recording of his traffic stop in bad faith) (unpublished opinion); State v. Wolf, *794 No. 2008 AP451-CR, 314 Wis.2d 748, 2008 WL 4630368 (Wis.Ct.App. Oct. 21, 2008) (affirming conviction for driving while intoxicated despite the State's loss of the video recording of the defendant's field sobriety test) (unpublished opinion); State v. Casselman, 141 Idaho 592, 114 P.3d 150, 153 (2005) (requiring a showing of bad faith in order to establish that the defendant's due process rights were violated when the police were unable to retrieve photographs after downloading them from a digital camera). Like these other states, Florida courts have consistently held that that the loss of the type of evidence in this case falls within the ambit of potentially useful evidence and requires bad faith on the part of the police to establish a due process violation. See, e.g., State v. Gomez, 915 So.2d 698, 701 (Fla. 3d DCA 2005) (finding no denial of due process after police lost booking photographs because the photographs were not material exculpatory evidence and police did not intentionally destroy them); State v. Thomas, 826 So.2d 1048, 1049-50 (Fla. 2d DCA 2002) (reversing dismissal of charges against the defendant after the State misplaced the video of the drug transaction because the recording was only "potentially useful” and the defendant failed to establish that the police acted in bad faith); Merck v. State, 664 So.2d 939, 943 (Fla.1995) (concluding that the police's failure to preserve clothing found during the murder investigation was not a due process violation because the defendant could not prove bad faith).

. We cannot avoid noting the irony that the potential evidence most likely to prove Mr. Bennett's innocence would have been the breath test that he chose not to provide.